1536

WESTLANDS WATER DISTRICT, San Benito Water District, Plaintiffs,

v.

Roger K. PATTERSON, Regional Director, Mid–Pacific Region, United States of America, Department of the Interior, Bureau of Reclamation; Bruce Babbitt, Secretary of the Interior, Defendants.

No. CV–F–94–5217 OWW DLB.

United States District Court, E.D. California, Fresno Division.

Aug. 23, 1994.

Thomas W. Birmingham, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for plaintiffs Westlands Water Dist. and San Benito County Water Dist.

Maria A. Iizuka, U.S. Dept. of Justice, Land and Natural Resources Div., Sacramento, CA, for U.S. Dept. of Justice Environment and Natural Resources Div.

Gregory K. Wilkinson, Best, Best & Krieger, Riverside, CA, for intervenors Friant Water Users Authority, Orange Cove Irrigation Dist., Shafter–Wasco Irrigation Dist. and Terra Bella Irrigation Dist.

Denslow B. Green, Green, Green & Rigby, Madera, CA, for Madera Irrigation Dist. and Chowchilla Irrigation Dist.

Michael V. Sexton, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, CA, for intervenor San Joaquin River Exchange Contractors Water Authority.

Jeffrey A. Meith, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, CA, for intervenor Friant Power Authority.

## MEMORANDUM OPINION AND ORDER RE: PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

WANGER, District Judge.

### I.

### INTRODUCTION

Plaintiffs Westlands Water District and San Benito Water District seek a preliminary injunction to enjoin 1994 water allocations under decisions made by the U.S. Bureau of Reclamation ("Bureau") and to compel "equitable apportionment" among other water districts. The motion is opposed by the Federal Defendants and defendants-in-intervention San Joaquin River Exchange Contractors,[1] the Friant Power Authority,[2] and certain members of the Friant Water Users Authority.[3]

The status of plaintiffs' counsel, the Kronick, Moscovitz law firm, the subject of a recusal motion by the Madera and Chowchilla Irrigation Districts, has been resolved by stipulation.

### II.

### BACKGROUND

On February 15, 1994, the Regional Director for the Bureau of Reclamation ("Bureau") announced annual water allocations for agricultural contractors for the 1994 water year. Plaintiffs were granted 35% of their contractual entitlement, and the San Joaquin River Exchange Contractors, 75%. On March 14, 1994 the Bureau announced that it could provide the Exchange Contractors with 100% of their contractual supply.

Plaintiffs allege that the Federal Defendants breached contractual obligations in ap-

---

1. These contractors are: Columbia Canal Company, San Luis Canal Company, Central California Irrigation District, and Firebaugh Canal Water District.

2. The Friant Power Authority is formed by the Chowchilla Water District, Madera Irrigation District, Orange Cove Irrigation District, Lindsay–Strathmore Irrigation District, Lindmore Irrigation District, Terra Bella Irrigation District, Delano–Earlimart Irrigation District, and Southern San Joaquin Municipal Utility District.

3. The Friant Users Authority is a joint powers agency consisting of 25 irrigation and water districts organized under California law, and is responsible for maintaining the Friant–Kern Canal. The intervening districts are: 1) The Orange Cove Irrigation District; 2) The Shafter–Wasco Irrigation District; and 3) The Terra Bella Irrigation District.

portioning water in shortage years. Plaintiffs complaint seeks relief on the following grounds:

> *First Claim for Relief:* For injunctive relief, based on the allegation that the Bureau's 1994 allocations are contrary to the provisions of the Westlands and San Benito water service contracts, and plaintiffs have no plain, speedy and adequate remedy at law;
>
> *Second Claim for Relief:* For declaratory relief, based on Article 11 of the Westlands contract, which obligates the Bureau to apportion water among those entitled to receive water from the San Luis Unit;
>
> *Third Claim for Relief:* For declaratory relief, based on Article 7(b) of the San Benito contract, which obligates the Bureau to apportion available water among water users, subject to prohibitions in existing contracts, CVP authorizations or a determination that some other method of apportionment is required to prevent undue hardship.

This motion seeks to preliminarily enjoin the Federal Defendants from implementing the 1994 water allocation plan and to require the Bureau to reduce water deliveries by the same percentage among the San Joaquin River Exchange Contractors and other agricultural water contractors capable of receiving water from the facilities of the Delta Division, the West San Joaquin Division, and San Felipe Division of the Central Valley Project.

### III.

### STANDARD FOR A PRELIMINARY INJUNCTION

■ A court may issue a preliminary injunction if the movant meets one of two tests: First, by showing:

(1) Strong likelihood of success on the merits;

(2) The balance of irreparable harm favors the movants; and

(3) The public interest favors granting the injunction.

*Landi v. Phelps,* 740 F.2d 710, 712 (9th Cir. 1984), citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 87 (9th Cir.1975); or second, by demonstrating:

> ... either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tip sharply in his favor.

*Id.* Under the second formulation, the Supreme Court requires that the public interest be considered where the public may be affected. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 967 (9th Cir. 1983). The Ninth Circuit has stated that the tests are not separate, but "represent[ ] two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Oakland Tribune v. Chronicle Publishing,* 762 F.2d 1374, 1376 (9th Cir.1985).

■ Where a mandatory preliminary injunction is sought that goes beyond maintaining the status quo *pende lite,* "courts should be extremely cautious about issuing a preliminary injunction." *Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994). In those circumstances, an injunction should not issue "unless the facts and law clearly favor the plaintiff." *Committee of Central American Refugees v. I.N.S.,* 795 F.2d 1434, 1441 (9th Cir.1986), *amended,* 807 F.2d 769 (9th Cir.1987).

### IV.

### DISCUSSION

#### Geographic/Historical Background [4]

The Central Valley Basin includes two main natural sources: 1) in the north, Shasta Lake to the Sacramento River, which together with its tributaries flow southward draining the northern part of the basin; and 2) the San Joaquin River and its tributaries, which

---

4. This background appears in full in *Gerlach Livestock Co. v. U.S.,* 76 F.Supp. 87, 90 (Cl.Ct. 1948), *aff'd,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), and *Wolfsen v. United States,* 162 F.Supp. 403, 421 (Cl.Ct.1958), *cert. denied,* 358 U.S. 907, 79 S.Ct. 233, 3 L.Ed.2d 228 (1958).

flow northward, draining the central southern portion. The two river systems join at the Sacramento–San Joaquin Delta, flow through Suisin Bay and Carquinez Straits into the San Francisco and the Pacific.

As early as 1870, Miller & Lux began acquiring land in the San Joaquin Valley. Within the next fifty years, the corporation became the owner of large tracts of riparian and non-riparian land near the upper San Joaquin River and its tributaries. Most if not all of this land was irrigated by Miller & Lux or through its subsidiaries and affiliated canal companies.[5] Through this process, Miller & Lux, and its companies, acquired riparian rights to the flows of the upper San Joaquin River. Until Friant Dam was built, at certain times during the year, the riparian users could not use all available water, causing uncontrollable flooding.

In the mid–1930's, the United States endeavored to expand the CVP into the Kern County/Bakersfield area. To do so, it was necessary to redivert the upper reaches of the San Joaquin River into the Friant–Kern Canal and the Madera Canal, by constructing the Friant Dam. Because Miller & Lux, and others, held vested rights to water necessary to accomplish that purpose, in July, 1939, the United States and the Exchange Contractors entered into two contracts: the Purchase Contract and the Exchange Contract.

Under the Purchase Contract, the Exchange Contractors sold all their San Joaquin River water rights to the United States, except for "reserved water," water to which the Exchange Contractors held vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their rights to reserved water, so long as they received substitute water from the Federal Delta–Mendota Canal, or other sources delivered to the Mendota Pool.[6] A second amended contract, dated September 15, 1967, is based on these 1939 Purchase and Exchange Contracts.

Millerton Lake, as it presently exists, was formed when Friant Dam was completed in 1942, and provides water to both the Madera Canal and the Friant–Kern Canal. In the 1940's, the Bureau entered into contracts with the water districts within the Friant Division. Friant Division agricultural water contractors receive water from both the Madera and Friant–Kern Canals.

The San Luis Unit of the CVP consists of the San Luis Dam and the San Luis Reservoir, together with a number of smaller facilities. The San Luis Reservoir was constructed to provide water to Merced, Fresno and Kings Counties, and is used to store surplus water from the Sacramento–San Joaquin Delta, for delivery to contractors such as Westlands and San Benito. The Delta–Mendota Canal is situated south of the Sacramento–San Joaquin Delta, and carries water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir.

**Background of the Present Litigation**

In 1992, Westlands filed suit against the Bureau, seeking injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq. Westlands v. U.S.*, CV–92–5212–OWW (E.D.Cal.). The complaint alleged: (1) the Bureau's intended diversion of water stored in the San Luis Reservoir violated the provisions of the San Luis Act and the Westlands and San Benito Contracts; (2) the Bureau lacked authority to divert water stored in the San Luis Reservoir; and (3) the amount of water stored in the San Luis Reservoir at the time of the filing of the complaint was sufficient to supply water to plaintiffs with additional water, making the Bureau's decision to divert this water to the Exchange Contractors, while maintaining only a fifteen percent allocations to plaintiffs, arbitrary, capricious and an abuse of discretion. Plaintiffs also sought a judicial declaration of the Bureau's contractual obligations to allocate water stored in the San Luis Reservoir during a shortage.

---

5. These were, among others: The San Joaquin & Kings River Canal & Irrigation Co., Inc.; Gravelly Ford Canal Co., Firebaugh Canal Company, Columbia Canal Co., San Luis Canal Co., and Santa Rita Irrigation Co. *Gerlach*, 76 F.Supp. at 90.

6. The Mendota Pool is formed at the confluence of the San Joaquin River, Fresno Slough and Delta–Mendota Canal.

Plaintiffs' complaint was dismissed without leave to amend. *Westlands Water District v. United States,* 805 F.Supp. 1503 (E.D.Cal. 1992). In finding that the Bureau did not act arbitrarily or capriciously in its 1992 allocation decisions, the district court stated:

> As California's drought entered its sixth year, the Bureau was faced with difficult water allocation decisions. The Bureau had the prerogative to exercise its allocation powers granted under the water shortage provisions in the relevant supply contracts. The Bureau cannot be faulted for honoring its legal commitments to holders of senior water rights, especially when it could do so without breaching its contracts with its agricultural contractors. The suggestion that a fifteen percent (15%) or twenty-five percent (25%) allocation to plaintiffs was unjustified based on actual water availability ignores the Bureau's power to determine and meet water needs on a project-wide basis. [footnote omitted]

The result was affirmed on appeal. *Westlands Water District v. Firebaugh Canal,* 10 F.3d 667 (9th Cir.1993). In its opinion, the Ninth Circuit expressed doubt about certain conclusions reached in the district court opinion:

> Neither the [San Luis] Act nor the Westlands contract prohibits the Bureau from using Reservoir water to meet its contractual obligations to the Exchange contractors, *and the Exchange contractors are therefore "entitled under the then-existing contracts to receive water from the San Luis Unit" under Article 11 of the Westlands contract. Likewise, the Exchange contractors are "capable of receiving water from the same Project facilities" under Article 7(b) of the San Benito contract,* whether "same Project facilities" is defined as the San Luis Unit or the whole CVP, since Reservoir water can be returned to the Delta–Mendota Canal.

*Id.* at 676 (emphasis added). The Ninth Circuit questioned the conclusion that San Benito's claim could be determined on the pleadings:

> We ... disagree with the district court that the San Benito contract's apportionment provision was inapplicable as a mat-

ter of law. Even if the district court was correct in ruling that the Exchange contractors had rights senior to the San Luis Contractors, the San Benito contract provides that apportionment is not required when doing so is "prohibited by existing contracts." Appellees did not establish as a matter of law that the Bureau had to divert Reservoir water to meet its contractual obligations to the Exchange contractors. One possibility is that the Bureau could have met those obligations by releasing water from Millerton Lake, as the Exchange Contract expressly contemplates. The pleadings alone do not resolve this issue.

*Westlands,* 10 F.3d at 675–76 (emphasis added and citations and quotations omitted). The Ninth Circuit also stated:

> We believe that the San Luis Contractors should not be foreclosed from arguing in a future suit that the Bureau has violated its contractual obligations to apportion water as required by the Westlands and San Benito contracts.

*Id.* at 677, n. 8. The circuit court also doubted certain conclusions about the Exchange Contractors' rights under state law:

> We are not convinced that the Exchange Contractors hold rights to Reservoir water which are superior to the rights of the San Luis contractors. It is true that some California cases recognize the general doctrines of "first in time, first in right" or "prior appropriation." [citations] However, these cases do not clearly decide the issue here. The Exchange contractors took water from the San Joaquin River prior to the contractual right to substitute water from the Delta–Mendota Canal or other sources. The Exchange Contract clearly gives them a contractual right to substitute water from the Delta–Mendota Canal or other sources. The Delta–Mendota Canal, however, takes water from the Delta which would otherwise wash into the sea. The Reservoir did not even exist at the time of the execution of the Exchange Contract. Article 4 of the Exchange Con-

tract requires the Government to give notice to future parties contracting for the use of San Joaquin River water of the prior rights of the Exchange contractors to water from different sources. Unlike the district court, we are not convinced that the Exchange contractors, prior appropriators of water from one river, have superior water rights (i.e. vested property rights) to water from a different source....

Plaintiffs do not raise this issue of California water law for reconsideration in this proceeding, expressly disclaiming the argument that superior state water entitlements justify the relief they seek. Plaintiff's Reply Memorandum, at 5:22–24 ("[T]o determine the rights of each group, this court must look to the contracts, not California water law").

## Likelihood of Success on the Merits

### Plaintiffs' Grounds for Relief

Plaintiffs argue that the Ninth Circuit raised questions as to the Bureau's preferential method of allocating CVP water to the Exchange Contractors. Plaintiffs contend that "equitable apportionment" is the proper method of allocation under both article 11(a) of the Westlands contract and article 7(b) of the San Benito contract. Article 11 of the Westlands contract states as follows:

(a) .... In any year in which there may occur a shortage from any cause, *the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water* from the San Luis Unit in accordance with conclusive determinations of the Contracting Officer as follows:

(i) A determination shall be made of the *total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit,* the quantity so determined being hereinafter referred to as the contractual commitments;

ii) A determination shall be made of *the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments,* the

quantity so determined being hereinafter referred to as the available supply;

iii) The *total quantity of water agreed to be accepted by the District during the respective year,* under Article 3 hereof, *shall be divided by the contractual commitments,* the quotient thus obtained being hereinafter referred to as the District's contractual entitlements; and

iv) The *available supply shall be multiplied by the District's contractual entitlement* and the result shall be the quantity of water required to be delivered by the United States to the District for the respective year ...

(emphasis added). Article 7(b) of the San Benito Contract provides:

In any year that the Contracting Officer determines there is a shortage in the quantity of water available to customers of the United States from the Project, *the Contracting Officer will apportion available water among the water users capable of receiving water from the same Project facilities by reducing deliveries to all such water users by the same percentage,* unless he is prohibited by existing contracts, Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship. In the event reduced deliveries within the Division are necessary, the water supplies for both M & I and agricultural use shall be reduced by the same percentage for each contractor.

Alternatively, plaintiffs argue that, if the Bureau wanted to fulfill both the Exchange Contractors' full contractual supply and provide plaintiffs with water according to the formula described in plaintiffs' water contracts, the Exchange Contractors' full share may be available from Millerton Lake through either releases or water transfers, as water contracts for districts within both the Friant and Delta–Mendota service areas are expressly subject to the Exchange Contractors' rights.

Plaintiffs argue that the Bureau is obligated to apportion water among the Exchange Contractors from other CVP sources to meet the contractual obligations for apportionment

in the Westlands and San Benito contracts. Plaintiffs argue that the Westlands and San Benito contracts do not contain a provision which subordinates their rights to the Exchange Contractors.

### Analysis

■ In *Westlands,* the Ninth Circuit raised questions about this court's conclusions reached on the pleadings alone, and the interpretation of certain phrases within plaintiffs' water service contracts. The Ninth Circuit did not have before it the CVP contract history giving rise to the rights claimed by the parties before the Court. Nor did the appeals court address whether the Bureau's 1994 allocation decisions were appropriate, under the apportionment provisions in the Westlands and San Benito contracts. The Ninth Circuit neither analyzed, nor resolved, all contractual interpretation issues involved. Unlike the earlier motion decided solely on the pleadings, evidence has now been presented both in support of and opposition to the motion.

Paragraph 31 of the Westland's contract authorizes challenges to the Bureau's actions under an arbitrary and capricious standard:

Where the terms of this contract provide for matters being done to the satisfaction of either party hereto, or *for action to be based upon the opinion or conclusive determination of such representative of either party hereto,* such terms are not intended to be and shall never be construed as permitting such satisfaction, opinion or determination of such a representative of either party to this contract to be *arbitrary, capricious or unreasonable;* and the District, notwithstanding any other provisions of the contract, *expressly reserves the right to relief from and appropriate adjustment for any such arbitrary, capricious or unreasonable satisfaction, opinion or determination.*

(emphasis added). Similarly, San Benito's contract states, at ¶ 32: [7]

Where the terms of the contract provide for actions to be *based upon the opinion or*

*determination of either party to this contract,* said term shall not be construed as permitting such action to be predicated upon *arbitrary, capricious, or unreasonable opinions or determination, whether or not stated to be conclusive.*

Under these provisions, the Bureau's actions would not constitute a breach of contract unless "arbitrary, capricious, or unreasonable." *Cf., Westlands,* 10 F.3d at 675 & n. 4 (noting deferential standard in favor of Bureau). Plaintiffs' proposed injunction asks the court to order the Bureau to act affirmatively to apportion water between the San Luis and Exchange contractors. This type of injunction is mandatory, requiring action beyond maintenance of the status quo pende lite. Taken together, plaintiffs must establish not only the possibility that the Bureau acted arbitrarily, capriciously, or unreasonably, but also that the facts and law are clearly in their favor. *Committee of Central American Refugees,* 795 F.2d at 1441.

■ Federal law controls the interpretation of a contract where the United States is a party. *United States v. Seckinger,* 397 U.S. 203, 209, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1032 (9th Cir. 1989). Although traditionally, an implementing agency is granted deference in its interpretation of statutes and regulations, where the rights at issue arise under contract the rule of agency deference is inapplicable. *Clay Tower Apartments v. Kemp,* 978 F.2d 478, 480 (9th Cir.1992). Ambiguous provisions are construed against the drafter, even if the drafter is the government. *Kennewick,* 880 F.2d at 1033, *citing, Seckinger,* 397 U.S. at 209–10, 90 S.Ct. at 884–85. In addition, "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." *Peterson v. United States Dept. of the Interior,* 899 F.2d 799, 807 (9th Cir.), *cert.*

---

**7.** San Benito has an additional burden in seeking relief. Article 32 of its contract requires, "[i]f the Contractor questions any determination made by the Contracting officer," that the Secre-

tary make findings of fact after consultation with the Contractor. The record does not demonstrate whether this procedure has been followed.

*denied* 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990), *citing, F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 87–88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958). The Westlands and San Benito contracts were authorized by Reclamation law, 43 U.S.C. §§ 371 *et seq.*

Article 11(a) of the Westlands contract reserves to the United States "the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit." Similarly, the San Benito contract requires the Bureau to apportion "available water." Defendants argue that the Exchange Contractors' rights are not included in the "available water supply" or "available water" within the meaning of the Westlands and San Benito contracts.

Article 11(a)(ii) of the Westlands contract defines "available water" as:

> ... the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments ...

(emphasis added).[8] Plaintiffs argue that nothing in either the Westlands or San Benito contracts gives the Exchange Contractors a priority to San Luis Reservoir water. But this argument ignores that a fundamental premise underlying CVP design and operation is a historical contractual priority in favor of the Exchange Contractors. According to documents submitted, the San Luis contractors, such as Westlands and San Benito, were intended to receive only surplus Delta water, that is, the "available water" after existing CVP obligations, such as the Exchange Contractors' priority, were satisfied.

In 1949, the Bureau of Reclamation published a document examining the feasibility of future CVP projects, titled "A Comprehensive Departmental Report on the Development of the Water and Related Resources of the Central Valley Basin" ("Feasibility Report"). This document was transmitted to Congress prior to the passage of the Act.[9] Before the San Luis Reservoir was built, winter and spring continued to bring more than sufficient water to the Central Valley, despite existing water users' needs. Because supply exceeded demand, each year millions of gallons of usable water wasted into the Pacific. The Feasibility Report states that the San Luis Reservoir was designed to hold this additional water, to increase the irrigability of dry lands on the west side of the San Joaquin. *See also,* H.R.Rep. No. 399, 86th Cong.2d Sess. (1960) ("The operation of the federal San Luis Unit would conserve and regulate *surplus wintertime water now wasting into the Pacific Ocean through the Golden Gate and make it usable, along with additional Central Valley Project Water from storage,* in the water-deficient San Joaquin Valley to the south") (emphasis added). As originally conceived,

> ... water for the west side upper San Joaquin Valley would be imported from Sacramento and lower San Joaquin Valleys via the Delta–Mendota Canal, Folsom–Newman, and Folsom–Ione–Mendota canals. Under initial development, it is contemplated that only the Delta–Mendota canal, which is authorized for construction under the Central Valley project, would be needed to provide a supplemental supply for presently irrigated lands and provide water for a considerable expansion in irrigated area. Water pumped into Delta–Mendota canal would be relifted into San Luis Reservoir.... *Pumping to the reservoir under initial development or in dry periods under ultimate development would be chiefly from surplus winter and spring flows from the Sacramento River.*

Feasibility Report, at 129–30 (emphasis added). Since the inception of the San Luis Unit, a priority for the Exchange Contractors had been contemplated. San Luis Res-

---

**8.** The San Benito contract does not define the term "available water." When viewing the operations of the CVP as a whole, the circumstances under which the San Benito contract was executed, and the subsequent conduct of the parties, the term "available supply" can only be read to have the same meaning in the San Benito contract as does "available water supply" in the Westlands' contract.

**9.** For this reason, in *Westlands,* 10 F.3d at 672, the Ninth Circuit recognized that the Feasibility Report was of "some importance" in interpreting the San Luis Act.

ervoir water, the source of water supply for the San Luis contractors, was intended to be:

> ... secured almost entirely by pumping through the Delta–Mendota canal *at such times as the full capacity of the canal is not required for initial Central Valley project needs.*

Feasibility Report, at 220 (emphasis added); *see also,* at 104, ("Water rights for existing irrigation developments are superior to any which may accrue to new developments"), *quoted in, Rank v. Krug,* 90 F.Supp. 773, 797 (S.D.Cal.(N.D.) 1950).

Although plaintiffs assert that no such "priority" appears in Westlands' or San Benito's contract, that concept is incorporated in the terms "available water supply" and "available water." This intent is echoed in the preamble to the Westlands contract, which states at page 3:

> WHEREAS, investigations of the stream flow in the Sacramento River, the Trinity River, the American River, the San Joaquin River, and their tributaries indicate *that there will be available for furnishing to the District from the San Luis Unit an additional water supply* for surface diversion and direct application for irrigation and directly or indirectly to replenish depleted ground water underlying the District; ...

(emphasis added). This background leads to the only reasonable interpretation of the term "available water" in the Westlands and San Benito contracts is not "all water available from the San Luis Unit," as plaintiffs assert, but "all water available after previous commitments have been met."

More recent Congressional discussion surrounding enactment of the Central Valley Project Improvement Act, public law, 102–575, 106 stat. 4600, recognizes the superior rights held by the Exchange Contractors, and the unavailability of CVP water for apportionment in dry years:

> A very significant change is how dry year shortages are dealt with. The House had suggested that the 800,000 acre-feet and the wildlife refuge water be subject to reduction only when shortages are imposed on *prior right and exchange right holders.* Aside from the implicit taking,

since those rights are secured under State law and are superior to any CVP right, that provision would have never worked in practice.

> During the current drought, prior right and exchange right holders agreed to forgo certain deliveries in order to permit the Secretary to make deliveries to the wildlife refuges and to urban users. *No reductions were imposed on them since no reductions could be imposed so long as there was any water.*

138 Cong.Rec. S17658, 17660 (Sept. 30, 1992) (statement of Sen. Wallop) (emphasis added).

The Westlands contract defines "available water" as water "available for meeting the contractual commitments." Article 11b. "Contractual commitments" are defined as:

> ... the total quantity of water agreed to be accepted during the respective year *under all contracts then in force* for the delivery of Central Valley Project water by the United States from the San Luis Unit ...

(emphasis added). Reclamation law defines a "contract" as:

> ... any repayment or water service contract between the United States and a district providing for the payment of construction charges to the United States including normal operation, maintenance, and replacement costs pursuant to Federal Reclamation law.

43 U.S.C. § 390bb(1). Under Reclamation law, the Secretary is authorized to "include a reasonable construction component in the rates set out in any long-term contract...." 43 U.S.C. § 485h–1(6); *see also* 43 U.S.C. §§ 485h(d) & (e). Under these provisions, water district contracts contain repayment obligations. *See, e.g.,* Westlands contract, at ¶ 6; San Benito contract, at ¶ 11. In contrast, the Exchange Contract contains no repayment provision, and does not list any "price" for the "sale" of irrigation water to the Exchange Contractors. The consideration for delivery of CVP water was an exchange of existing riparian rights, to enable the expansion of the CVP. Because the Exchange Contract lacks any provision "for the payment of construction charges to the Unit-

ed States including normal operation, maintenance, and replacement costs pursuant to Federal Reclamation law," the Exchange Contract is not part of the "contractual commitments," nor a "contract[ ] then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit," as described by the Westlands contract. *See, Peterson,* 899 F.2d at 807 (contracts must be read in light of enabling legislation). Under that same reasoning, the Exchange Contract is outside of the terms "under *all contracts then in force* for the delivery of Central Valley Project water by the United States from the San Luis Unit" under Section 11(a)(i) of the Westlands contract and prior right.

The 1967 Second Amendatory Contract for Exchange of Waters states in the recitations:

WHEREAS, it was however recognized in said Purchase Contract dated July 27, 1939, that the Contracting Entities were entitled to use beneficially certain other waters of the San Joaquin ... and,

WHEREAS, under said Exchange Contract since approximately July 16, 1951, the United States has been and is storing and diverting said reserved waters of the San Joaquin River for use within and without the watershed of said river by others than the Contracting Entities, and has been and is supplying the Contracting Entities in lieu of such waters with substitute water from the Sacramento River, the Sacramento–San Joaquin Delta and other sources through the Delta–Mendota Canal of said Project and by other means....

Article 4(a) of the 1967 Exchange Contract recognized that this history provides the Exchange Contractors with a priority:

The United States may hereafter, either whole or in part, store, divert, dispose of and otherwise use, within and without the

watershed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than the Contracting Entities *so long as, and only so long as, the United States does deliver to the Contracting Entities by means of the Project or otherwise substitute water in conformity with this contract.*

(emphasis added). The Exchange Contractors continue to hold riparian rights necessary to the CVP's inclusion of the Friant users.[10] In return for their riparian rights, the Exchange Contractors agreed in the Exchange and Purchase contracts to accept substitute water, primarily from the Sacramento River. 1967 Amendatory Exchange Contract, Article 5. The Exchange Contract does not contemplate the same type of supply and repayment that other water districts have, as described in 43 U.S.C. § 390bb(1).[11]

The San Benito contract provides that apportionment begins when the United States determines that "there is a shortage in the quantity of water available to customers of the United States." "Customer" is not defined in the San Benito contract. Generally, a "customer" is a "buyer, purchaser, consumer or patron," or "one that purchases usually systematically or frequently a commodity or service." Black's Law Dictionary, at 386 (6th ed. 1990); Webster's New Collegiate Dictionary, at 278 (1981). Other water contractors purchase water on a yearly basis; they are clearly "customers of the United States." The Exchange Contractors' position is far less clear. Viewing the transactions in context, it is not arbitrary and capricious for the Bureau to interpret San Benito's contract to exclude the Exchange Contractors from the category "customers of the United States." The Exchange Contract contains no purchase

---

**10.** At article 16, the Exchange Contract states: This contract shall never be construed as a conveyance, abandonment or waiver of any water right or right to the use of water of the Contracting Entities ...

**11.** The remedy in the event of a permanent failure of supply further supports the view that the Exchange Contract is more than a repayment contract. In those circumstances, the United States agreed that:

... the Contracting Entities shall receive the said reserved waters of the San Joaquin River as specified in said Purchase Contract and the United States hereby agrees to release at all such times said reserved waters at Friant Dam. Article 4(c), 1967 Exchange Contract. Because the Exchange Contract provides a reversion to the Exchange Contractors their original riparian rights, it is distinguishable from a repayment contract, within the meaning of § 390bb(1).

provision, nor is exchange of water defined as a "contract" under Reclamation law. Because they provide water to enable the Friant Division to operate, the Exchange Contractors are appropriately found to be "suppliers" of water, rather than "customers of the United States."

■ In determining the meaning of a contract, the parties' conduct subsequent to its formation is entitled to "great weight." *Arizona Laborers, Teamsters and Cement Masons v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir.1985). Although water shortages caused reductions in water deliveries by the Bureau in 1977 and 1990 through 1993, those shortages were never apportioned among the Exchange Contractors. Exhibit 22, at ¶ 8 (Declaration of Richard Moss). Westlands did not protest the lack of apportionment until the 1992 litigation, almost fifteen years after the initial shortage occurred.

Additionally, in operating the CVP, the Bureau has viewed the Exchange Contractor's rights as superior to those of other contractors. In October, 1992, the Bureau published a document titled "Long Term Central Valley Project Operations Criteria and Plan" ("OCAP"). Exhibit 1. Although not determinative of the meaning the Westlands contract, one statement bears on the conduct of the parties subsequent to the contract's execution, and is therefore entitled to "great weight":

> Water demands for the [Delta Mendota Canal] and San Luis Unit are primarily composed of two separate types—CVP water service contractors and exchange contractors. *A significantly different relationship exists between Reclamation and these two groups.* Exchange contractors "exchanged" their senior water rights to water in the San Joaquin River for a CVP water supply from the Delta. Reclamation thus guaranteed the exchange contractors a firm water supply of 840,000 acre-feet per anum, with a maximum reduction in water-short years of 25 percent. Conversely, water service contractors did not have water rights to "exchange." Water service contractors also receive their supply from the Delta, but their supplies are subject to reductions that can exceed 25 percent.

Exhibit 1, at p. 62; *see also,* 1967 Exchange Contract, Article 8 (maximum reduction in critically dry years is three-quarters of maximum contractual supply). The OCAP demonstrates the Bureau does not consider the San Luis Reservoir as a source to be apportioned among all entities in critically dry years. The Bureau recognizes the Exchange Contractors, as senior water rights holders, with superior rights to water service contractors. Pro rata apportionment, as sought by plaintiffs, is conceptually inconsistent with the Exchange Contractor's superior rights.[12]

Analysis of the results that would occur if plaintiffs' arguments were accepted demonstrates that plaintiffs' interpretation is not reasonable. In the event of a temporary shortage of water, the Exchange Contract provides, at Article 4(b), that after the first seven days, "the United States shall make up such quantities by releases of available storage from Millerton Lake" to minimum storage capacity. Taking water from Millerton to meet the Exchange Contractors would directly impact the Friant contractors, who depend on Millerton as a primary source of supply.[13] Yet all twenty-seven Friant water districts' contracts contain a provision reading:

> The rights of the District under this contract are subject to the terms of the Contract for Exchange of waters dated July 27, 1939, between the United States and the San Joaquin and Kings River Canal and Irrigation Company, incorporated and others ... *the United States agrees that it will not deliver to the Contracting Entities thereunder waters of the San Joaquin River unless and until required by the terms*

---

12. Although amended in 1967—after the 1963 Westlands contract was executed—the Exchange Contract contains no apportionment formula.

13. Rather than regularly obtaining water from Millerton, the Exchange Contract provides at article 5(a):

> It is anticipated that most if not all of the substitute water provided the Contracting Entities hereunder will be delivered to them via the aforementioned Delta–Mendota Canal.

*of said contract so to do* and the United States further agrees that *it will not voluntarily and knowingly render itself unable to deliver to the parties entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries of the Sacramento–San Joaquin Delta* those quantities required to satisfy the obligations of the United States under said Exchange Contract and under Schedule 2 of the Contract for the Purchase of Miller and Lux Water Rights.

*See also*, Exhibit 34, at ¶ 5. In 1959, when the San Luis expansion was contemplated by the Bureau, the Friant contractors had threatened that, unless such a provision existed in their contracts to protect the Exchange Contractors' priority, they would oppose the Bureau's place of use permit application before the California State Water Resources Control Board. A letter dated October 31, 1959, from Mr. Robert E. Moock, who represented the Friant Districts, states:

> I told the group [in a conference with the Bureau of Reclamation] that the Friant–Kern area would not go for this expansion of place of use unless the United States recognized a preference for the exchange contract and that water necessary to serve the present service areas of the Contra Costa Canal.... To my surprise, my suggestion was somewhat favorably received, and it appears to me that the time is ripe for the procurement of a commitment from the Bureau of Reclamation for the preferential treatment of the exchange contract which we have been seeking....

*See*, attachments to Declaration of Denslow Green (March 25, 1994). Other letters submitted confirm this effort. *See*, attachments to Stipulation (April 8, 1994) (November 19, 1959, letter of Adolf Moskovitz: "I believe this is an excellent opportunity for the Friant water users to obtain binding contractual assurances of the preferential status of the exchange contract"). According to a memorandum of understanding drafted by Thomas Clarke, the Solicitor for the Bureau, on December 29, 1959, just prior to the authorization and construction of the San Luis Unit, the Bureau assured the Friant contractors that their source of water supply would not be impacted by the delivery of water to San Luis contractors, stating:

> ... I confirm to you that it has been, is and will continue to be the policy and practice of the United States to utilize the water available.... from the Sacramento River and its tributaries and the Sacramento–San Joaquin Delta to first satisfy the requirements of the Exchange Contract and Schedule 2 of the Purchase Contract so long as it is legally and reasonably physically possible to satisfy these requirements; provided that the United States has not; and will not voluntarily impair the delivery of water required to satisfy those requirements.

The final result of these negotiations are the amendments to the Friant contracts, quoted above. The Westlands and San Benito contracts were executed after the Friant amendments. To interpret the Westlands and San Benito contracts to deprive the Friant contractors of their prior rights to CVP water to all twenty-seven Friant contracts, contravenes the Bureau's entire course of conduct in developing the San Luis Unit and is unreasonable.

Obligations specified in the Friant contracts also weigh against a finding of arbitrary, capricious or unreasonable government conduct in failing to apportion under the San Benito contract, which excludes any obligation to apportion when "prohibited by existing contracts," here, the Friant contracts. The amended Friant contracts obligate the Bureau to refrain from "voluntarily and knowingly render[ing] itself unable to deliver to the parties entitled thereto" substitute water from the Delta to satisfy the Exchange Contractors' rights. "Equitable apportionment" in dry years would render the Bureau unable to satisfy the Exchange Contractors' rights from the Delta. For example, in critically dry 1994, the evidence indicates the San Luis Reservoir contains insufficient water to satisfy both the apportionment provision in the Westlands and San Benito contract and the Exchange Contractors' needs. Exhibit 34, at ¶ 8. As a consequence, releases from Millerton would be required to satisfy the Exchange Contract, such that the Friant con-

tractors would receive nothing for the 1994 water year. *Id.* at ¶¶ 8, 9. The Bureau did not act arbitrarily, capriciously, or unreasonably by failing to apportion water under the San Benito contract, when to do so would result in allocating no water during the 1994 summer months to satisfy the prior rights of twenty-seven Friant contracts.

Apportionment in 1994, in effect, "would force the abandonment of this portion of the project which has not only been fully authorized by Congress but paid for through its continuing appropriations. Apportionment would prevent fulfillment of the contracts made by the United States with the [Friant] Water and Utility Districts ..." *Dugan v. Rank,* 372 U.S. 609, 621, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963). That all Friant contracts foresaw and were designed to prevent the conditions sought to be imposed by plaintiffs, completely contradicts plaintiffs' asserted interpretation. Millerton Lake is not a readily available alternative source to the Exchange Contractors.

■ Apportioning water with the San Luis contractors each shortage year ignores the substance of the Exchange Contractors' riparian rights, and could result in periodic takings under the just compensation clause. *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 734, 70 S.Ct. 955, 960–61, 94 L.Ed. 1231 (1950), recognizes that Congress intended Reclamation law to be carried out respecting rights vested under state law, such as the vested riparian interests held by the Exchange Contractors:

> We cannot disagree with claimants' contention that in undertaking these Friant projects and implementing the work as carried forward by the Reclamation Bureau, Congress proceeded on a basis of full recognition of [existing] water rights having valid existence under state law ... We think this amounts, not to authorizations and declarations creating causes of action against the United States, but to aware-

ness and approval of administrative construction. We think it clear that throughout the conception, enactment, and subsequent administration of the plan, Congress has recognized the property status of water rights vested under California law.

Section 8 of the 1902 act requires the Bureau to "defer to the substance, as well as the form, of state water law." *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 3001, 57 L.Ed.2d 1018 (1978); 43 U.S.C. § 383. "[T]he President has approved and the Congress has confirmed the commitment by the United States to the obligation to replace the waters of the San Joaquin River with waters from the Sacramento River." *Wolfsen v. United States,* 162 F.Supp. 403, 407–08, 142 Ct.Cl. 383 (1958), *cert. denied,* 358 U.S. 907, 79 S.Ct. 233, 3 L.Ed.2d 228 (1958) (noting California legislature's intent that "no right to the use of water shall be gained or lost by reason of any exchange thereof"): [14]

> The diversion of San Joaquin waters was authorized only because of the commitment to substitute water from the Sacramento River. We do not believe that the United States could, with impunity, take away the substituted waters.

*Wolfsen,* 162 F.Supp. at 406. Plaintiffs' reading of the Westlands and San Benito contracts would mean that the Bureau obligated itself to Westlands and San Benito, under provisions that could require just compensation to the Exchange Contractors each shortage year. That interpretation is not reasonable.

Plaintiffs have not shown the law and facts clearly favor their contention that the Bureau acted arbitrarily, capriciously or unreasonably this critically dry year in failing to apportion water with the Exchange Contractors. As a matter of contractual interpretation, the Exchange Contractors' share does not fit within the definition of "available wa-

**14.** Although plaintiffs have not grounded their present motion on state law, *Wolfsen* indicates that such a challenge would not be successful. Although the Ninth Circuit stated without analysis that it was "not convinced that the Exchange contractors, prior appropriators of water from one river, have superior water rights (i.e. vested property rights) to water from a different source," *Westlands,* 10 F.3d at 676, *Wolfsen* indicates that such a distinction is a "legal technicality" that does not interfere with the Exchange Contractors' substantive rights. *Id.,* 162 F.Supp. at 406.

ter" or "available water supply," nor are the Exchange Contractors among those entities having a "contract for water delivery from the San Luis Unit," as that term is used in the Westlands contract, or a "customer," as that term is used in the San Benito contract. Apportionment is not required. Taking plaintiffs' contracts in the context in which they were executed, and read in light of Reclamation law, plaintiffs' asserted interpretations are unreasonable and violate fifty years of water contracting history.

Plaintiffs assert the Bureau's inability to satisfy the Exchange Contractors' needs has become "permanent" within the meaning of the Exchange Contract, and that the Exchange Contractors are only entitled to the natural inflow to Millerton, not to water stored in Millerton. In support, plaintiffs submit a letter dated October 23, 1993, from the Bureau's Regional Financial Manager, written to Jason Peltier, Manager of the Central Valley Project Water Association. The Peltier letter states that San Luis contractors and other named contractors are likely to receive the reduced amounts of water over the next several years, at least until the year 2026. Part of plaintiffs' argument rests on the contention that the Exchange Contractors are "contractors" within the meaning of the Reclamation act. For the reasons stated in this memorandum, that argument is rejected. The Peltier letter does not establish that the Exchange Contractors will suffer a "permanent" reduction. The letter states that "all other contractors" should receive a 100% supply. This anticipates a full supply, not a permanent reduction, in the Exchange Contractors' needs.

Plaintiffs have not shown that the law and facts clearly establish that they are likely to prevail on the merits of their claims.

**Balance of Hardships/Irreparable Injury**

Even if the facts and law clearly favored plaintiffs, preliminary injunctive relief could not be granted based on the balance of hardships. Plaintiffs argue that they will suffer irreparable injury if relief is not granted. According to Steven Ottemoeller, Westlands' Chief of Operations, if preliminary relief is not granted: 1) the District will be harmed by decreased revenues, resulting in deferred maintenance and possible jeopardy of District operations; 2) groundwater pumping will become necessary, causing subsidence, overdrafting of groundwater basins and decreased ground water quality; 3) increased fallow acreage causing dust emissions; 4) increased soil degradation due to poor-quality groundwater; and 5) increased unemployment. Exhibit 10, at ¶¶ 9–14. Plaintiffs also argue that no adequate remedy at law exists, because their contracts do not provide for monetary relief in the event of a breach by the United States. The declaration of David Orth demonstrates that financial difficulties arising from capital expenditures and maintenance, and other adverse impacts on Westlands' financial condition, will result if preliminary injunctive relief is withheld. Exhibit 53, at ¶ 7. Agricultural water users within Westlands will also suffer harm if preliminary relief is not granted. Exhibit 54.

Defendant-intervenors have submitted considerable evidence of greater hardship that injunctive relief would cause. If Friant Division releases from Millerton Lake are compelled to meet the needs of the Exchange Contractors, water would have to be transported along the dry and porous San Joaquin River bed to reach Mendota Pool. Taking into account an estimated seepage loss of forty percent that would occur en route, the required release from Millerton is 443,000 acre-feet. Currently, only 480,000 acre-feet of water is forecasted to be available to meet the Friant user's needs—which would reduce each Friant user's share to less than five percent of normal. The Bureau of Reclamation calculates that the Friant contractors might receive no water at all. Exhibit 34, at ¶¶ 8, 9. The hardship to the Friant contractors, and those who depend upon them, which predominantly farm permanent crops, as contrasted with row crops farmed by plaintiffs' members, would be devastating.

The Federal Defendants have also submitted evidence showing an adverse impact on Southern California Edison Company's hydroelectric power generation facilities, which are upstream of Millerton. Exhibit 34, at ¶ 11. If San Joaquin River water is diverted back to the Exchange Contractors, Southern

California Edison must revise its water release patterns. *Id.*

Plaintiffs discount the possibility of water loss during conveyance, proposing that the transfer could be accomplished through a "trade" for state water resources. Plaintiffs argue that the Bureau could exchange Friant Division water for state-owned water currently in the San Luis Reservoir. The state-owned water could then be released to plaintiff districts. Plaintiffs suggest that the Bureau could provide water from outside sources: For example, the Yuba County Water Agency, Placer County Water Agency, and Sacramento River Water Right Exchange Contractors have all expressed a willingness to transfer water. Although any such transfer is subject to approval by the State Water Resources Control Board ("SWRCB"), plaintiffs argue it is reasonable to assume ("SWRCB") approval would be forthcoming.

Federal Defendants have submitted evidence that plaintiffs' proposed transfers are problematic due to legal and practical constraints. According to Lowell Ploss, Chief of CVP Power Operations:

1) No legal authority exists to mandate such transfers;

2) If legal authority did exist, there are no appropriated funds to permit acquisitions from the state;

3) There is no guarantee the Bureau could acquire the water in the amounts and time frame required to resolve the present dispute, due to other demands for CVP water;

4) Agreement with other agencies [15] is necessary, and has not been obtained.

Exhibit 63, at ¶ 3. Water transfers are not a viable solution for an additional reason. Transfers are contingent on state approval. Because agencies necessary to securing approval for water transfers have not be joined as parties, ordering relief requiring water transfers would be ineffective. No jurisdiction exists to order the non-party state entities to authorize such transfers.

According to Harvey Williams, Secretary–Manager of the Shafter–Wasco Irrigation District, farmers without groundwater wells in that district would lose over $23 million in crops. Declaration of Harvey Williams, at ¶ 6a (Mar. 24, 1994). If permanent crops are not supplied with a minimum amount of water, they may have to be destroyed, resulting in a $19.8 million loss. *Id.* The cost to replant permanent crops is over $15 million. *Id.* For farmers with groundwater wells, Williams estimates that increased pumping costs and reduction in groundwater supplies will occur, resulting in an additional costs of over $20,000. *Id.* at ¶ 6b.

The Friant Power Authority states that its principle source of power generation is dependant on releases from the Friant Reservoir, to the outlets to the Madera and Friant–Kern Canals. Declaration of John E. Boudreau, Manager of Friant Power Authority, at ¶ 7 (March 24, 1994). Releases to Westlands or San Benito would not, as the system is presently configured, pass through either of these canals. If relief is granted, the Power Authority would be unable to generate any significant amount of power at Friant. The Power Authority was financed with a $40 million bond, which was previously in default due to drought conditions. *Id.* at ¶ 6. Although the bond is currently in good standing because 1992 was a wet year, granting the relief requested by plaintiffs:

... would place the project in a hole from which it may never recover. Any hope of refinancing the project would be lost.

*Id.* at 10.

James C. Chandler, manager of the Orange Cove Irrigation District, which is dependent on the Friant district for its water supply, estimates that granting the preliminary injunction would result in lost revenues and costs to farmers in that district, including effects that would be suffered over the next five years, at over $500,000,000. Exhibit 24, at ¶ 9. The failure to produce crops during the 1994 year alone result in $92,200,000 of that figure. *Id.* John Boudreau, manager of the Terra Bella Irrigation Dis-

**15.** These are: 1) The California Department of Fish and Game; 2) U.S. Fish & Wildlife Service; 2) National Marine Fisheries Service; 4) California Department of Water Resources. Exhibit 63, at ¶ 3(d).

trict anticipates that a preliminary injunction would result in an estimated $177,000,000 loss, to be suffered over the next five years.

The Exchange Contractors' water share is based on the run of the Sacramento River, rather than a yearly acre-feet allocation. Consequently, the Exchange Contractors must use water within certain calendar months. According to the schedule in the Exchange Contract, if the requested relief is granted, the Exchange Contractors will be entitled to 381,000 acre-feet from April through October, 1994. During the summer months, it is anticipated that both Millerton and the San Joaquin River will be at minimum capacity, and insufficient water would be available to irrigate the Exchange Contractors' land.[16] *Id.* at ¶ 10. Because of the history of the Exchange Contractors continued supply of water, which has continued without reduction below 75% over the past several decades, permanent plantings and crops vulnerable to dry weather exist throughout the Exchange Contractors' lands. *Id.* at 6. Because these permanent plantings would be lost, and other crops unable to survive the lack of irrigation, the Exchange Contractors estimate that the resulting loss will be $130 million. *Id.* at 19.

Despite the recitation of dollar losses above, the balance of hardships is not explained by numbers alone. An injunction which would result in five-to-zero percent releases to the Friant contractors would have a devastating effect on water users, employees and communities within the affected districts. The intangible effects that flow from the enumerated economic consequences would, in the words of Mr. Boudreau, "threaten the very existence of the [districts] and the community." Exhibit 25, at ¶ 5. In addition, preliminary injunctive relief would have potential long-term effects on debt repayment and the availability of continued financing. The potential harm to others dependent on the present system outweighs potential benefit that would accrue to plaintiffs.

Because plaintiffs have not shown that the balance of hardships tips in their favor, preliminary injunctive relief is not warranted.

**Public Interest**

 The public interest must be considered where the public may be affected by injunctive relief. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 967 (9th Cir.1983).

An increasingly scarce water supply must be spread yet thinner in this critically dry year. After considering all the evidence submitted, it is apparent that the effect of granting relief would cause greater harm than to leave the allocations determined by the Bureau. The court cannot manage the CVP. To the contrary, the law requires deference to the expertise and experience of the Bureau as water manager of the CVP. Defendants have submitted considerable evidence that the effects of granting injunctive relief would create extreme hardship. Although plaintiffs would derive some benefit from relief, they have failed to establish a legal entitlement to the water they seek. Granting relief in these circumstances is against the public interest.

**CONCLUSION**

After reviewing the papers filed both in support of and opposition to the motion, considering the evidence and arguments of counsel presented at the hearing on the motion, and for the reasons stated in open court and in this memorandum decision:

1) Plaintiffs have not demonstrated that the law and facts entitle them to "equitable apportionment" with the Exchange Contractors, based on a reading of the respective contracts and related material;

2) Even if such a showing could be made, plaintiffs have not shown that the balance of hardships tips in their favor, given the devas-

16. For temporary interruptions of service, the Exchange Contract provides:

 ... that the United States in no event be required to draw the storage in Millerton Lake below Elevation 464.00 U.S.G.S. datum or to retain water in storage in Millerton Lake in anticipation of future need for such releases. According to the Exchange Contractors, 1994 is anticipated to be the fourth driest year on record.

tating effect that injunctive relief would have on defendants;

3) The public interest does not favor granting the relief sought. Although plaintiffs would derive some benefit from preliminary relief, the communities in the Friant division would be severely and disproportionately impacted. The Exchange Contractors would also be severely impacted. In addition, plaintiffs have not shown that the Bureau has breached any legal obligation to apportion water to plaintiffs from entitlements due with the Exchange Contractors;

Plaintiffs' motion for a preliminary injunction is DENIED.

SO ORDERED.