Filed 1/30/25  Sierra Club v. Del Puerto Water District CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SIERRA CLUB et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DEL PUERTO WATER DISTRICT, <br><br> Defendant and Respondent; <br><br> SAN JOAQUIN RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, <br><br> Real Party in Interest and Appellant. | F085896/F086218 <br><br> (Super. Ct. No. CV-20-005193) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John R. Mayne, Judge.

Law Office of Donald B. Mooney and Donald B. Mooney for Plaintiffs and Appellants.

Remy Moose Manley, James G. Moose, Christopher L. Stiles and Laura M. Harris; Minasian Law and Andrew John McClure for Defendant and Respondent.

Minasian Law and Andrew John McClure for Real Party in Interest and Appellant.

-ooOoo-

The Del Puerto Water District (DPWD)[1] and the San Joaquin River Exchange Contractors Water Authority seek to build a reservoir near Patterson, California to store their water allotments from the Central Valley Project. The Sierra Club et al., challenged the Environmental Impact Report (EIR) for the reservoir project on several grounds. The trial court rejected several of those challenges, but accepted others and ordered the EIR to be decertified.

The Sierra Club appealed the judgment and the Exchange Contractors cross-appealed. The Exchange Contractors also appealed the trial court's denial of their motion to vacate the judgment, and we have consolidated that appeal with this one.

We conclude that each party has at least one meritorious contention, and will reverse the judgment in part and remand with instructions.

## BACKGROUND

### I.      Water in California

Broadly speaking, much of California's water is in the north and much of its demand is in the south. (*Natural Resources Defense Council v. Kempthorne* (2009) 621 F.Supp.2d 954, 959–960.) As a result, the government created """"a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure"""" (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 840) in order to store surplus flows from the rivers in the north and transport them south. (*San Luis & Delta-Mendota Water Authority v. U.S. Dept. of Interior* (E.D.Cal., Mar. 2, 2015, No. 1:11-cv-00952 LJO GSA) 2015 U.S. Dist. Lexis 24970.) The system, called the Central Valley Project (CVP), delivers water to hundreds of water contractors pursuant to various delivery contracts, primarily for agricultural use in the Central Valley. (*North Coast, supra*, at p. 840.)

---

[1]      We will refer to Del Puerto Water District and its board of directors, both of which are parties on appeal, as DPWD.

### *Friant Dam and the Exchange Contract*

In the mid-1930's, the federal government wanted the CVP to extend into the Bakersfield area. (*Westlands Water Dist. v. Patterson* (1994) 864 F.Supp. 1536, 1539 (*Westlands Water Dist.*).) To accomplish this, the San Joaquin River would need to be diverted into the Friant-Kern and Madera Canals. (*Ibid.*) This diversion would be effected by building Friant Dam.

To accomplish this, the federal government needed to acquire the water rights necessary for such a diversion. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 692.) It did so in 1939 by entering into two contracts with the existing water rights holders (i.e., the Exchange Contractors): a purchase contract and an exchange contract. (*Westlands Water Dist., supra*, 864 F.Supp. at p. 1539.)

"Under the Purchase Contract, the Exchange Contractors sold all their San Joaquin River water rights to the United States, except for 'reserved water,' water to which the Exchange Contractors held vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their rights to reserved water, so long as they received substitute water from the Federal Delta–Mendota Canal, or other sources delivered to the Mendota Pool." (*Westlands Water Dist., supra*, 864 F.Supp. at p. 1539, fn. omitted.)

### *CVP's Transportation of Water from Delta*

While the Friant Division of the CVP operates on the east side of the Valley, the CVP also has substantial infrastructure on the west side of the Valley. The CVP operates a pumping plant that moves millions of acre-feet of water from the Bay-Delta (Delta) to the Delta-Mendota Canal (DMC), which carries the water south along the western edge of the San Joaquin Valley.[2] (*San Luis & Delta-Mendota Water Authority v. Jewell* (9th

---

[2] The DMC also has an inter-connection with the California Aqueduct west of the City of Tracy and connects with the State Water Project (SWP) at the O'Neill Forebay.

Cir. 2014) 747 F.3d 581, 594; *State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 692; *In re Bay Delta etc.* (2008) 43 Cal.4th 1143, 1154.) DMC waters are pumped into the San Luis Reservoir for storage.[3] When water is released from the San Luis Reservoir back into the DMC, it can continue on to the Mendota Pool—a small reservoir created by the Mendota Dam. At the Mendota Pool, the DMC waters replace the natural flow of the San Joaquin River. (*State Water Resources Control Bd. Cases, supra*, at p. 692.)

### Coordination With SWP

The State of California has its own water project with reservoirs, dams, power plants, pumping plants, canals and aqueducts (SWP). (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 898–899.) In 1986, the California Department and Water Resources and the United States Bureau of Reclamation (Reclamation) signed a coordinated operating agreement. The coordinated operating agreement defines each project's responsibility to protect other beneficial uses of water and defines the sharing of excess water between the projects.

## II. The Project

The project at issue in this case is a proposed dam and reservoir connected to the DMC, west of the City of Patterson. The proposed reservoir would provide 82,000 acre-feet of storage. The project would also include three saddle dams, a spillway, inlet/outlet works, and conveyance facilities (including a diversion/outfall facility on the DMC, and a pumping plant).

The partners behind the project are DPWD and the Exchange Contractors (the Project Partners). As noted above, the Exchange Contractors receive CVP waters pursuant to the 1939 contracts (and subsequent agreements) with the United States. The

---

[3]     The San Luis Reservoir also stores water from the SWP delivered by the California Aqueduct.

4.

Exchange Contractors have a contractual water allotment of 840,000 acre-feet during noncritical years. In critical years, the allotment is reduced to 75 percent, or 650,000 acre-feet. The Exchange Contractors desire to stabilize their water supplies by storing water allocated during noncritical years for use during critical years.

DPWD has its own water service contract with Reclamation through which it purchases CVP waters. In some recent drought years, DPWD received no water at all.

The reservoir would store water delivered pursuant to the Project Partners' contracts for delivery of waters from the DMC. The reservoir would also capture some flows from the Del Puerto Creek. These are the only two sources of water anticipated to fill the reservoir. If any other water sources would be used in the future, project-specific environmental review would then be conducted.

### *Procedural History*

In June 2019, DPWD issued a notice of preparation (NOP), generally describing the project as "a reservoir located on Del Puerto Creek in the foothills of the Coast Range Mountains west of Patterson, California and Interstate-5." The reservoir would provide 85,000 acre-feet of water storage. The NOP also noted the project would involve construction of a main dam, four saddle dams, a spillway, inlet/outlet works, conveyance facilities, and electrical facilities; and would involve relocation of existing utilities.

A draft EIR (DEIR) was issued in December 2019, and notice was given that it would be available for public review beginning December 12, 2019.

The final EIR (FEIR) was made available to the public and commenting agencies on October 9, 2020. Pertinent details of the DEIR and FEIR are described below in connection with the issues raised on appeal.

On October 21, 2020, the DPWD Board voted to certify the FEIR and approve the project.

On November 20, 2020, the Sierra Club, California Native Plant Society, Center for Biological Diversity, and Friends of the River (petitioners) filed a petition for writ of

5.

mandate in Stanislaus Superior Court.  The petition sought to set aside the FEIR and the approval of the project.

The court accepted briefing, including sealed briefing regarding petitioners' claim the FEIR failed to sufficiently analyze impacts to cultural resources, and heard oral argument.  On October 31, 2022, the court issued a ruling rejecting several of petitioners' contentions, but granting the writ "as to failure to adequately address the relocation of Del Puerto Canyon Road."  The court addressed the confidential cultural resources issues in a separate minute order dated November 29, 2022, in which it ruled in favor of petitioners.

Pursuant to a stipulation of the parties, the court issued an order on December 27, 2022, making alterations to the details of its October 31, 2022 ruling, but generally reiterating the same substantive ruling.

## DISCUSSION

**I. The FEIR Was Not Required to Have a Different Project Description or Offer Additional Analysis Concerning the Speculative Possibility Reclamation Might Alter Delta Pumping Operations in the Future**

### A. *Law*

An EIR must describe the project under consideration, including its location and "[a] general description of the project's technical, economic, and environmental characteristics .…"  (Cal. Code Regs., tit. 14, § 15124, subds. (a), (c).)

An EIR must also identify and describe both direct and indirect environmental impacts of the project.  (Cal. Code Regs., tit. 14, § 15126.2, subd. (a).)  This includes both direct physical changes to the environment caused by the project and reasonably foreseeable indirect physical changes that may be caused by the project.  (Cal. Code Regs., tit. 14, § 15064, subd. (d).)  However, this does not include indirect impacts that are speculative.

## B.    *Additional Background*

The FEIR concluded that the proposed operation of the project would not affect CVP or SWP pumping operations at the Delta.  The FEIR added that the project could provide Reclamation additional flexibility to increase pumping if it so chose, as a result of increased storage capacity and increased flexibility to alter when water would be pumped to Project Partners.  The FEIR noted that "[a]ny such modification of Delta pumping *by Reclamation* would be evaluated *by Reclamation* in a separate NEPA[4] document if such pumping is determined to be outside existing certified environmental documentation and/or operating agreements."  (Italics added.)

## C.    *Analysis*

Sierra Club contends the FEIR's project description failed to disclose how the project will affect diversions from the Delta.  This, in turn, purportedly also rendered the impacts analysis insufficient.  Project Partners respond that the project will not affect diversions from the Delta.

Reclamation increasing (or otherwise altering) Delta outflows is not the project at issue here.  The project is construction of a reservoir.  And it is the environmental impacts of the project that must be analyzed, not those of some other project that may materialize in the future.

We acknowledge that EIR's must *usually* consider both direct and indirect impacts.  However, indirect impacts can literally reverberate into the future indefinitely.  As these branches of possibilities grow exponentially into the unknown future, it quickly becomes unhelpful and infeasible to analyze or even identify speculative possibilities.  Thus, when indirect impacts are attenuated to the level of speculation, they need not be evaluated.

---

**4**    National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. § 4321 et seq.).

"Courts have made clear that 'CEQA[5] does not require evaluation of speculative impacts.'" (*League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 139.) While an EIR must examine even the *potential* for a project to impact the environment, that "does not mean … that a potential impact, no matter how speculative, must be considered in an EIR." (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1451 (*Save Round Valley Alliance*).)

Specifically, the mere fact that some other future action has been proposed does not necessarily require its inclusion in the EIR. (See *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1127.) Indeed, where future developments are unspecified and uncertain, the EIR is not required to speculate as to future environmental consequences. (*Ibid*.) "It has long been recognized that premature attempts to evaluate effects that are uncertain to occur or whose severity cannot reliably be measured is 'a needlessly wasteful drain of the public fisc.'" (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1061.) "Evaluation of future environmental effects must await the future decisions that could cause the effects." (*Topanga Beach Renters Assn. v. Department of General Services* (1976) 58 Cal.App.3d 188, 196.)

Consequently, across a variety of CEQA contexts, courts have declined to invalidate an EIR for failing to discuss the potential environmental impacts of speculative, hypothetical future responsive actions by third parties.

For example, in *Save Round Valley Alliance*, the proposed project was to subdivide 74 acres into twenty-seven 2.5-acre parcels for development into single family residences. The challengers argued that the EIR should have analyzed what would happen if the future lot owners chose to build *two* residences on each site. The challengers alleged the failure to consider this possibility caused the EIR to persistently

---

**5**     California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).

understate the project's environmental impacts. The court rejected this argument, observing that whether second units would be built "depends initially upon the desires of future lot owners, who are unknown." (*Save Round Valley Alliance, supra*, 157 Cal.App.4th. at p. 1450.) The court continued, "even if the building of some second units might be foreseeable, it is impossible to predict how many units will be built, the size of such units, on which lots they might be built, their location within a lot, the visibility of a second unit from outside the subdivision, or how such units might impact the environment." (*Id* at p. 1450.)

In *Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, the project was a water district's moratorium on new water service connections. The trial court concluded the EIR was deficient in several respects, including that it failed to "analyze adequately the potentially significant adverse secondary environmental effects of the moratorium .…" (*Id.* at p. 1659.) Specifically, it was acknowledged that after five or six years, the moratorium would create "increased pressure for growth and development in areas outside the District's service area." (*Id* at pp. 1662–1663.) However, the nature and extent of future development and its environmental impacts would depend on what the local agencies in those jurisdictions permitted. The court affirmed the water district's conclusion "that the potential environmental impact of possible future development elsewhere was simply too speculative to evaluate .…" (*Id.* at p. 1663.)

In *Yerba Buena Neighborhood Consortium, LLC v. Regents of University of California* (2023) 95 Cal.App.5th 779, the project was a plan to make substantial changes to one of UCSF's campuses, including new buildings. (*Id.* at p. 788.) Challengers to the EIR asserted it should have analyzed indirect impacts the project would have on vehicle miles traveled. (*Id* at p. 807.) The court rejected that challenge, observing it relied "on the speculative assumption that implementation of the [project] will lead to the transit system being overwhelmed and [that] transit users will resort to private automobiles

9.

instead." (*Ibid.*)  In other words, the challengers were improperly demanding that the EIR address speculative environmental effects that would be caused by third parties changing their conduct in response to the project.

Analogous here, challengers assert a third party (i.e., Reclamation) will alter its behavior (i.e., increase/alter pumping) after construction of the project, causing environmental impacts that should have been analyzed in the EIR.  However, it is speculation to assume the alleged increase of capacity in San Luis Reservoir or the increased flexibility of pumping schedules would lead to Reclamation increasing Delta outflows.  It is simply unknown how operations at the Delta may change in the future due to the actions of third parties.  (See *Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 755-756.)  It was not incumbent on the FEIR to speculate that Reclamation might choose to alter its behavior based on the project and then to analyze the environmental impacts of that speculative possibility.

As an aside, we observe that even if Reclamation did choose to increase pumping from the Delta at some point in the future, that action would either (1) be within limits set by existing approvals, which have already satisfied any applicable environmental review requirements or (2) exceed existing approvals, which would almost certainly necessitate federal and/or state environmental review at that point.  The FEIR explains as much: "Any … modification of Delta pumping by Reclamation would be evaluated by Reclamation in a separate NEPA document if such pumping is determined to be outside existing certified environmental documentation and/or operating agreements."

### *Piecemealing*

Sierra Club claims the FEIR's approach fails to account for the whole of the action, and instead chops up a single project into "bite-size pieces."

"Improper piecemealing occurs 'when the purpose of the reviewed project is to be the first step toward future development' or 'when the reviewed project legally compels or practically presumes completion of another action.'  [Citation.]  By contrast, an EIR

10.

need not analyze 'specific future action that is merely contemplated or a gleam in a planner's eye.'" (*East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 293 (*East Sacramento Partnerships*).)

In order to accept Sierra Club's contention, we would have to conclude that the construction/operation of Del Puerto Canyon Reservoir and Reclamation's increase of Delta outflows are, in fact, a single project disguised as two.  Or, in other words, that the FEIR made a "calculated selection of [a] truncated project concept .…"  (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 200.)  That is not what occurred here.  While there is a theoretical possibility that Reclamation *could* export additional water, in no way does the construction of the reservoir "'compel[]'" or "'practically presume[]'" an increase in Reclamation's pumping at the Delta.  Instead, Sierra Club has "'merely contemplated'" (*East Sacramento Partnerships, supra*, 5 Cal.App.5th at p. 293) that Reclamation *could* hypothetically engage in such action.  Building a reservoir and increasing pumping at the Delta are not a single project.

### Contradictory Statements

Sierra Club asserts that the FEIR's claim the project will not affect Delta pumping operations is "illogical" because the project was intended to enable DPWD "'to accept water when excess is available that would otherwise be lost due to lack of means to store'" the water.  But Sierra Club fails to sufficiently explain how these two concepts are necessarily illogical or contradictory.  In theory at least, water could be "lost" to the Project Partners because they lack sufficient storage to accept delivery at the time it is available, resulting in that water instead being stored in San Luis Reservoir or given to other south-of-the-Delta users, without any increase in Delta pumping.

The fact remains that the FEIR clearly concludes that the project will not affect CVP or SWP Delta pumping operations.  In this way, the present case is quite distinguishable from *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645 (*Raptor*), on which Sierra Club relies.  In that case, the EIR insisted in

11.

several places that the mine expansion project would not result in an increase in mine production. Elsewhere, however, the EIR indicated that the mine might sometimes operate at a new peak capacity of 500,000 tons per year, more than double the prior four-year average production of 240,000 tons per year. (*Id.* at pp. 655–656 & fn. 4.) This was an inherent and irreconcilable conflict in that case's EIR.

Nor is this case like *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70. That case involved a project to renovate a crude oil refinery. The court held the project's EIR was misleading because it "claim[ed] that the Project is designed to allow more flexibility in refining future crude supplies that the EIR describes as 'increasingly heavier,' but on the other hand, denie[d] that the Project will enable the [r]efinery to process heavier crude." (*Id.* at p. 83.) Additionally, the project proponent's filings with the United States Securities and Exchange Commission clearly indicated the project was intended to "'increase the flexibility to process lower API-gravity crude oils .…'" (*Id.* at pp. 83–84.) Here, there is no analogous indication that the FEIR was incorrect or misleading when it stated the project will not cause increased pumping from the Delta.

### Baseline

Sierra Club also contends the FEIR used the wrong baseline. "An EIR must include a description of the physical environmental conditions in the vicinity of the project. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.…" (Cal. Code Regs., tit. 14, § 15125, subd. (a).) "An existing conditions baseline shall not include hypothetical conditions, such as those that might be allowed, but have never actually occurred, under existing permits or plans, as the baseline." (*Id.*, subd. (a)(3).)

Specifically, Sierra Club contends the FEIR erred in omitting environmental impacts of increased pumping "solely because the CVP would continue to operate within existing permit limits regardless of Project approval." But that is not why the FEIR omits

environmental impacts of increased pumping in the Delta. The FEIR omits that analysis because the project will not cause increased pumping from the Delta, and therefore the project will not cause the environmental impacts that might result from said increased pumping. Increased pumping would be *caused* by Reclamation's decision to do so, not construction of the proposed reservoir.

## III. The EIR Fails to Adequately Analyze Potential Impacts to Downstream Terrestrial Species

Petitioners next contend the FEIR fails to analyze potential impacts to downstream terrestrial species.

### A. *Law*

An EIR must discuss significant environmental impacts of the project. (Cal. Code Regs., tit. 14, § 15126.) An EIR must also briefly discuss effects of a project that were determined not to be significant. (*Id.*, § 15128.) Certain impacts on wildlife and/or their habitat are required to be found significant. (*Id.*, § 15065, subd. (a)(1).)

"'[A] reviewing court must determine whether the discussion of a potentially significant effect is sufficient or insufficient, i.e., whether the EIR comports with its intended function of including """detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project."""'" (*Natural Resources Defense Council, Inc. v. City of Los Angeles* (2023) 98 Cal.App.5th 1176, 1204.) "The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*Sierra Club*).)

### B. *Analysis*

As noted, Sierra Club contends the FEIR fails to properly discuss potential impacts to downstream terrestrial species. We agree. While the FEIR analyzes adjacent issues—e.g., impacts to downstream *aquatic* species and impacts to terrestrial species that are *not* downstream—it does not analyze impacts to downstream terrestrial species.

13.

The study area of the FEIR's section on terrestrial biological resources was: "the footprints of the proposed project infrastructure, the maximum inundation area, areas where utilities may need to be relocated, any areas of potential disturbance related to constructing the proposed project, and a 300 foot buffer around these areas .…" In other words, the study included areas that will be disturbed by construction, the areas that will be inundated by water, and a 300-foot buffer. It does not reference downstream Del Puerto Creek, the flows of which will be impacted to some extent by the project (at least in terms of annual volume). Thus, this portion of the FEIR does consider impacts to terrestrial biological resources, but only those in the study area and not those downstream.

In contrast, the FEIR's section on impacts to fish does consider whether there will be downstream impacts. In responding to Sierra Club's contentions, Project Partners emphasize this analysis, which concluded that the operation of the project would ensure that major flow events would be released downstream of the proposed dam in order to mimic the natural patterns of flow variability. Specifically, it observes that,

> "Under proposed project operations, major flow events in Del Puerto Creek would continue to be released downstream of the proposed dam as part of the environmental commitments of the project. These environmental flow requirements include operation of the dam to bypass major flow events in a pattern that preserves key components of the peak flow events (*Section 2.3.1, Reservoir Operations*). This is consistent with the 'functional flow' approach of managing flows in regulated rivers to mimic the natural patterns of flow variability that drive the geomorphic and ecological processes supporting native *aquatic* species (Yarnell et al. 2015)." (Italics added.)

However, this analysis expressly refers to aquatic species. So while it considers impacts to downstream species, it does so for aquatic rather than terrestrial species. Similarly, the Project Partners emphasize pages 2405–2405 of the administrative record, but that section also quite clearly applies to impacts on fish and aquatic species. What is

14.

missing is analysis of whether there will be impacts to species that are both downstream and terrestrial.

It may very well be the case that the project's efforts to mimic natural patterns of flow variability will result in the project having no impacts to downstream terrestrial species. That is a scientific matter on which we offer no input.[6] What matters in the present action is that the FEIR does not expressly conclude as much. As a result, it fails as an informational document to adequately consider a potentially significant environmental impact.

## IV. Substantial Evidence Supports the Agency's Methodology in Studying Biological Resources

Sierra Club argues that many of the "biological resources surveys conducted during EIR preparation produced little information because they were poorly timed" (e.g., wet vs. dry years) and were not sufficiently comprehensive.

### A. *Standard of Review*

"It is well established an agency has discretion in selecting the methodology to be used in evaluating environmental impact, subject to review for substantial evidence." (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 337.) The substantial evidence standard "applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)

---

[6] If the FEIR had made such a conclusion with respect to downstream terrestrial species, we would review it under the deferential substantial evidence standard. However, since the FEIR omits such analysis/conclusions, it is an issue of law.

15.

However, Sierra Club insists,

"[this] is not a dispute over methodology, but instead, whether the EIR provided an adequate analysis to inform, which is a question of law. [Citation.] Both [California Native Plant Society] and [Department of Fish and Wildlife] identified the need to properly conduct surveys to make an impact determination. [Citation.] As DPWD's inclusive surveys were reconnaissance level (protocol-level) and/or done at the improper time, the EIR fails to provide an informed understanding of a critical aspect of the Project's environmental impacts."

While Sierra Club posits this is not a "dispute over methodology," it immediately goes on to describe a dispute over methodology.[7] Specifically, whether the FEIR is insufficient because the studies were reconnaissance-level rather than protocol-level or whether they were "done at the improper time." Consequently, we review the Sierra Club's contention under the substantial evidence standard.

## B.    *Additional Background*

Wildlife surveys and an aquatic resources delineation was conducted in the spring and summer of 2019. Biologists conducted botanical surveys in the fall of 2019, and again in the spring of 2020.

Biologists conducted a general habitat evaluation "to determine whether suitable habitat exists for special-status plant and animal species" from May through July 2019. In addition to wildlife observations made during field surveys, motion-activated trail cameras were placed near the mouth of Del Puerto Canyon in June 2019. Prior to the field surveys, biologists reviewed databases to evaluate whether special-status species or sensitive biological resources could occur in the study area. During the botanical surveys and aquatic resources delineation survey, 297 plant species were observed.

---

[7]    Sierra Club also contends that *Sierra Club* is the controlling authority on the standard of review issue. But even that case was quite clear that "a decision to use a particular methodology and reject another is amenable to substantial evidence review .…" (*Sierra Club, supra*, 6 Cal.5th at p. 514.)

It was determined that five special-status plant species occur or have been reported from the study area. The FEIR acknowledged that the project could result in direct, substantial impacts to these species.

It was also determined that 22 special-status wildlife species may occur in the study area or could be affected by the project.

## C.    *Analysis*

Sierra Club observes that springtime plant surveys were conducted during a dry year. They point to the FEIR's observation that two special-status species that could have been present were not found in the study area, possibly due to the fact that recent rainfall was 14 percent of normal, which could have caused the species not to produce seedlings. But every study or survey could be made better in some way. A one-year study could have been a two-year study. A two-year study could have been a three-year study. That is, "[a] project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 (*Laurel Heights*).) But just because further study would be helpful does not mean it is necessary. (*Ibid.*) Biologists conducted botanical surveys in the fall of 2019, and again in the spring of 2020, and those surveys identified several species in the study area. While they did not find the two species referenced by Sierra Club, the FEIR appropriately acknowledged that the lack of observation did not exclude the possibility they were present given the lower-than-average rainfall. Indeed, the FEIR even *presumed* the two species were extant in the study area despite not being observed. We conclude Sierra Club has failed to show these botanical studies were insufficient.

Sierra Club similarly observes that wildlife surveys were conducted in "dry months" and not "wet months," even though the project might affect amphibians. Sierra Club cites nothing in the record establishing that amphibians cannot be adequately observed during the dry months of the year—an unstated but necessary premise to its

17.

claim the surveys were insufficient. This relatively undeveloped contention cannot be sustained on substantial evidence review.

Sierra Club also criticizes the use of reconnaissance-level studies rather than protocol-level studies. The FEIR explained its use of reconnaissance-level field studies as follows,

> "reconnaissance level field studies were conducted to evaluate the presence of sensitive plants and wildlife. The evaluation of impacts on biological resources was not exclusively done through the use of databases and maps though these resources were employed to assist in characterization of habitats and identification of species that have been previously found in the project area. This is standard practice for evaluation of potential project effects in CEQA documents because protocol-level surveys can take multiple seasons to complete and the results of surveys are typically valid for a limited period of time and thus may no longer be valid by the time construction begins. Protocol level surveys would be conducted during the appropriate season and in accordance with accepted methods prior to the start of construction, and preconstruction surveys would be conducted during the appropriate time frame as described in the mitigation measures presented in the Draft EIR prior to initial ground disturbing activities associated with project construction. The mitigation measures in the Draft EIR include commitments to conduct protocol-level surveys for sensitive plant species, vernal pool branchiopods, California tiger salamander, California red-legged frog, foothill yellow-legged frog, Swainson's hawk and San Joaquin kit fox. Because protocol level surveys have not been conducted, the EIR assumes presence of species where suitable habitat is present."

Sierra Club criticizes this approach because the fact that a particular survey costs money is not a justification for omitting the information. But that was not the justification. The EIR stated that protocol-level studies were not yet included because they "are typically valid for a limited period of time and thus may no longer be valid by the time construction begins." Consequently, Sierra Club is incorrect to assert that the FEIR "provides zero justification" for the lack of protocol-level surveys.

## V.    The FEIR Did Not Improperly Defer or Inadequately Discuss Mitigation Measures

Sierra Club contends the FEIR improperly defers mitigation of impacts on special-status plants, foothill yellow-legged frogs, San Joaquin kit foxes, American badgers, riparian and wetlands habitat, and oak woodland habitat.  Specifically, Sierra Club asserts the FEIR failed to give a reason for deferral and did not set standards of performance.

### A.    *Law*

An EIR must describe feasible measures that could minimize significant adverse impacts.  (Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(1).)  These are referred to as "mitigation measures."  The general description of mitigation measures may not be deferred and must be included in the EIR.  "[T]he specific details of a mitigation measure, however, may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure.…"  (*Id.*, subd. (a)(1)(B).)

### B.    *Additional Background*

### *Vernal Pool Branchiopods*

Vernal pool fairy shrimp and vernal pool tadpole shrimp were not observed in the study area.  However, habitat suitable for vernal shrimp was observed.  The construction and operation of the project would result in the permanent loss of up to 1.4 acres of such habitat.  That loss would have a substantial adverse effect on federally listed vernal pool branchiopods and was therefore determined to be a significant environmental impact.

To mitigate this significant impact, the FEIR described what it called Mitigation Measure BIO-TERR-1c as follows:

> "At least one year prior to impacting any of the potential vernal pool branchiopod habitat, a biologist with a 10(a)(1)(A) recovery permit for

19.

vernal pool branchiopods shall conduct protocol level surveys for federally listed vernal pool branchiopods following the [United States Fish and Wildlife Service's] 2015 Survey Guidelines for the Listed Large Branchiopods. These surveys require the completion of one dry season survey and one wet season survey. If no federally listed branchiopods are present no further mitigation would be required other than requirements under federal and state laws protecting wetlands. If federally listed branchiopods are determined to be present and are located in permanent disturbance areas then the Project Partners shall compensate for the loss of federally listed vernal pool branchiopod habitat through the purchase of credits from a [United States Fish and Wildlife Service] approved mitigation bank at a conservation acreage of 2:1 protection and 1:1 restoration."

The FEIR concluded this mitigation measure would reduce the environmental impact to less than significant because lost habitat would be replaced.

### *Foothill Yellow-legged Frog*

The FEIR also concluded that the project would cause the permanent loss of habitat for the foothill yellow-legged frog, more favorable conditions for its predators, behavior disruption caused by lighting, and injuries/mortality from maintenance activities and associated traffic. The FEIR determined the loss of habitat and direct injury/mortality constituted a significant environmental impact.

The EIR described Mitigation Measure BIO-TERR-1h as follows,

"If surveys determine that foothill yellow-legged frog is not present in Del Puerto Creek no further mitigation is necessary. If foothill yellow-legged fro[g] is present, the habitat permanently impacted due to the proposed project shall be fully mitigated by either purchasing property and/or a conservation easement that contains stream habitat of similar quality and quantity and that is currently occupied by foothill yellow-legged frog and/or represents an area that has been historically occupied and where successful recolonization is likely (e.g., known occupation in nearby watershed or tributary). A final mitigation plan shall be developed and approved by [California Department of Fish and Wildlife]. The plan shall include measures for the long-term management of these lands for the benefit of foothill yellow-legged frog and include adaptive management measures."

The FEIR concluded that this measure, combined with others described in the FEIR, would reduce the project's impacts on the foothill yellow-legged frogs to less than significant.

### *San Joaquin Kit Foxes*

The FEIR stated that the contiguous habitat in the project footprint was likely too small to support occupancy of San Joaquin kit foxes. However, it was unknown where and how frequently kit foxes would disperse through the study area. Researchers did locate an entry in the California Natural Diversity Database from the mouth of Del Puerto Canyon and two additional entries reported road mortalities along Interstate 5.

The project would result in the permanent loss of up to 197 acres and would cause temporary disturbance to 82 acres of potential kit fox habitat. Operational and construction activities could cause injury or mortality to kit foxes.

In response, the FEIR presented Mitigation Measure BIO-TERR-1o, which provided for a preconstruction survey to be completed no less than 14, and no more than 30 days before the beginning of ground disturbance. The biologist conducting the survey was required to systematically canvass the area with transects spaced 30–100 feet apart to ensure 100 percent visual observation of the area. If dens were located, they were to be classified as being in one of four defined categories. If dens are located, avoidance buffers will be applied based on the classification of the den.

### *American Badger*

The FEIR found the project would have a substantial adverse effect on the American badger, including permanent loss of up to 973 acres, and temporary effects on up to 530 acres, of potential habitat. The project would also disrupt normal behaviors, potentially cause injury and/or mortality of the American badger.

The FEIR presented Mitigation Measure BIO-TERR-1q, which included a preconstruction survey by a biologist no more than 30 days before ground disturbance. The biologist will conduct den searches with transects of between 30–100 feet, ensuring

21.

100 percent visual coverage of the area. If unoccupied dens are located in the work area, the biologist would either receive permission from the Department of Fish and Wildlife to temporarily block the burrow entrance to prevent badger usage during construction or, if necessary, would collapse the den by hand. If occupied dens are located in the work area, the biologist would consult with the Department of Fish and Wildlife regarding the best practice to encourage the badger to move to alternate dens outside work areas. This Mitigation Measure, along with others, was determined to reduce the impacts of the American badger to less than significant.

### *Riparian Habitat*

The FEIR concluded the project's construction and operation would result in the permanent removal of over 16 acres of riparian woodland and 19 acres of riparian wetlands.

The EIR presented Mitigation Measure BIO-TERR-2, as follows,

> "Riparian habitat shall be created or acquired and permanently protected to compensate for project effects to ensure no net loss of riparian habitat functions and values. Land that could be acquired could include acres upstream of the reservoir or elsewhere that satisfied appropriate compensation ratios. Compensation ratios shall be based on site-specific information and determined through coordination with state and federal agencies [(California Department of Fish and Wildlife, United States Fish and Wildlife Service, United States Army Corp of Engineers, State Water Resources Control Board]). The compensation shall be at a minimum 1:1 ratio (1 acre restored or created for every 1 acre filled) and may be a combination of offsite restoration/creation and mitigation credits. A restoration and monitoring plan shall be developed and implemented concurrently with project construction. The plan shall describe how riparian habitat will be created and monitored, including funding mechanisms and appropriate long-term management measures, and agency reporting requirements."

The FEIR concluded the mitigation measure would reduce impacts on riparian habitat to less than significant.

22.

*Wetlands*

The FEIR stated that the proposed project would result in the permanent loss of over 32 acres of riparian wetlands, seeps, seasonal wetlands, and ponds, which constituted a significant environmental impact.

Like the mitigation measure for riparian habitat, Mitigation Measure BIO-TERR-3 for wetlands provided for creation or acquisition of suitable wetland habitat to compensate for project effects. The minimum compensation ratio was set at 1:1. The compensation could be a combination of offsite restoration/creation and mitigation credits. A restoration and monitoring plan would be developed and implemented, which would describe how wetland habitat will be created and monitored.

*Blue Oak Woodlands*

The FEIR observed that the project would result in a loss of 39 acres of blue oak woodlands. The FEIR presented Mitigation Measure BIO-TERR-5 whereby one acre of oak woodland would be preserved, managed and monitored for every acre of oak woodland loss as a result of project implementation. A management plan would be developed for the newly preserved oak woodland.

**C.    *Analysis***

Sierra Club contends these portions of the FEIR impermissibly defer formulation of mitigation for the Project's impacts on foothill yellow-legged frogs, San Joaquin kit foxes, etc. It criticizes the FEIR for relying on "unknown provisions of undeveloped plans" as mitigation measures. However, the mitigation measures are the purchasing of mitigation bank credits, substitute property, conservation easements, etc. It is the creation of management plans *for the purchased properties, easements, etc.* that is deferred to a later date—not plans governing the actual construction/implementation of the project.

It would be infeasible to do otherwise. Whether off-site mitigation is even needed is dependent on pre-construction surveys that have not yet occurred. And even presuming such mitigation will be required, the size of offsetting land/easements to

23.

satisfy the stated compensation ratios is presently unknown. Consequently, it is unknown whether and/or how much land/credits will need to be purchased. This also means that the location of the offsetting land/easements is likewise unknown. As a result, a description of the mitigation/management plans for said properties is not currently feasible. For example, how could the FEIR be expected to set forth the details of a plan to manage offsite land for the benefit of foothill yellow-legged frogs when the location, size, terrain, etc. of that land is unknown. Such a plan would obviously have at least some site-specific aspects and therefore cannot be set forth unless and until a site is selected.

The fact is, the cited mitigation measures commit the project proponents to acquisition of credits/land/easements in specific ratios to resources impacted by the project as determined by pre-construction surveys. This is definite enough to constitute a valid mitigation measure. This conclusion is not altered by the fact that the specifics of how the offsetting land/easements themselves will be managed are not described and are instead deferred for future formulation. The aspects of the mitigation measures that *are* presently formulated are sufficiently definite.

We find *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899 (*Rialto*) to be instructive. In that case, the EIR provided that a mammalogist would conduct a habitat assessment in the future and, if certain endangered kangaroo rats were found, the project proponent would consult with United States Fish and Wildlife and/or the City of Rialto "'*to determine the appropriate off-site mitigation*, which requires that mitigation/compensation for the loss of the kangaroo rats be approved through Section 10(a) consultation pursuant to the [federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.)], as well as specific measures, including, but not limited to, avoidance, minimization and *purchase of suitable off-site habitat*, *as well as monitoring and funding for the maintenance of the site*.'" (*Id.* at p. 943, italics added.)

The court concluded the mitigation measure was "sufficiently definite to ensure that potential impacts to the … kangaroo rats will be mitigated." (*Id* at p. 946.)

*Rialto* is closer to the present case than *Raptor*, relied on by Sierra Club. In that case, the EIR deferred formulation of plans for managing *the project itself* in a way to avoid/mitigate impacts in the first instance. (*Raptor, supra*, 149 Cal.App.4th. at pp. 668–670.) The *Raptor* court held that such plans were improperly deferred. (*Id.* at p. 671.) Here, the mitigation measure is the purchase of off-site credits/land, and it is the formulation of management plans for those yet-to-be-acquired, off-site properties that is deferred, not plans to manage the construction/project itself. Because there are clear standards for the mitigating purchases (e.g., defined ratios, requirement of "full" mitigation, etc.), the plans for managing the purchased land/easement themselves are "specific details" that could be deferred. (See Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(1)(B).)

Sierra Club next contends the FEIR fails to prove that these mitigation measures are achievable, since there is not an endless supply of mitigation bank credits or special-status wildlife habitat for sale. But the fact that a mitigation measure involves finite resources—and nearly all of them do—does not mean the FEIR must affirmatively prove those resources exist. We are aware of no such requirement in CEQA, and it would be surprising to have such a requirement. For example, if a measure mitigating traffic impacts called for construction of an interchange, the EIR is not required to prove or explain that there is enough asphalt in the world to build it. Here, the mitigation measures involve the purchase of mitigation bank credits and/or off-site land purchases/easements. These are common mitigation measures and, absent a comment raising the issue in a manner requiring a response, we will not presume an inadequate supply so as to require explanation in the FEIR.

Using the mitigation of the foothill yellow-legged frog as an example, Sierra Club contends it is unclear how much off-site mitigation will be necessitated if the species is located in pre-construction surveys:

> "Since the EIR projects potentially significant impacts to 31 acres of aquatic habitat and 16 acres of riparian habitat [citation], will that amount of compensatory mitigation be required if frogs are located in pre-construction protocol-level surveys?  Or some other amount?  The EIR is silent on this issue, a deficiency that infects multiple mitigation measures."

But the EIR is not silent on the issue. Rather, it provides that if frogs are found, the habitat permanently impacted by the proposed project shall be *fully* mitigated through purchases of property/conservation easements.  The word "fully" makes clear that off-site mitigation would be at least equivalent to 31 acres of aquatic habitat and 16 acres of riparian habitat.

## VI.     The FEIR's Statement of Purpose Was Sufficient

Sierra Club argues the FEIR used an impermissibly narrow statement of purpose. Specifically, the FEIR "fails to identify a reasonable basis for its imposition of a[n] 80,000 [acre feet storage] requirement."

### A.     *Law*

An EIR must contain a "statement of the objectives sought by the proposed project." (Cal. Code Regs., tit. 14, § 15124, subd. (b).)  The statement should include "the underlying purpose of the project." (*Ibid.*)  A clearly written statement helps the lead agency develop a reasonable range of alternatives to evaluate in the EIR.  (*Ibid.*)

However, "CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a particular set of objectives. CEQA simply requires the agency to thereafter prepare and certify a legally adequate EIR …." (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 276–277.)  By definition, it is the project proponent who determines what project they are proposing.  Consequently, project objectives can be quite narrow.  For example, a proponent who

wants to build a waterfront resort can insist its proposed project be waterfront, and not inland. (See *In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1166.) The issue arises when the objective is "artificially" narrow. (*Ibid.*)

**B.** *Analysis*

As noted above, CEQA is not concerned with narrow project objectives unless they are *artificially* narrow. In other words, when the purported project objectives are insincere attempts to avoid true consideration of a reasonable range of alternatives rather than accurately express the true underlying intent motivating the project proponents. There is no such indication here.

The FEIR's stated project objectives were the following:

1. Increase south of Delta water storage capacity in California's Central Valley by 80,000 acre feet;

2. Provide local water storage in proximity to the DMC and to users;

3. Improve water supply reliability;

4. Increase peak irrigation season water supplies;

5. Improve the ability to manage regional surface water and groundwater resources;

6. Improve regional self-reliance and economic benefit from agricultural production, jobs, and industry multipliers;

7. Develop a cost-effective project that provides water at an affordable cost to landowners; and

8. Avoid displacement of homes and businesses.

Sierra Club contends the FEIR fails to identify a reasonable basis for a project with 80,000 acre feet of storage capacity because the Project Partners only need 70,000 acre feet. But the FEIR did provide a reasonable basis when it stated,

> "In addition to the up to 50,000 [acre feet] storage need identified by the Exchange Contractors and the 20,000 [acre feet] demand for storage identified by DPWD, the Project Partners are working to obtain federal

27.

funding and accommodate federal benefits that would be commensurate with the funding. The Bureau of Reclamation would have an opportunity to participate in the project for South of Delta benefits providing new water supply and up to 20,000 [acre feet of storage] for wildlife refuges."

Sierra Club has failed to show the stated project objective of providing 80,000 acre feet of storage capacity south of the Delta was *artificially* narrow. Consequently, we see no error in its usage to eliminate alternatives from detailed consideration. Moreover, we note that the FEIR *did* consider an alternative that was smaller in terms of capacity: a reservoir with half of the storage capacity (i.e., 40,000 acre feet).

Sierra Club further contends that the objective to create 80,000 acre feet of storage does not explain the choice of constructing a reservoir instead of using smaller and/or groundwater recharge projects.[8] But creating 80,000 acre feet of storage was only one of eight objectives. Among the other objectives were improving the reliability of the water supply, increasing water supply during peak irrigation season, and improved management of regional water resources. And as the FEIR explained, "Groundwater storage facilities cannot bank large volumes of water in a short period of time and similarly groundwater extraction cannot occur rapidly enough to meet seasonal demands in the same way that is possible with a surface storage facility." In other words, a reservoir satisfies other project objectives in a way that groundwater recharge projects would not.[9]

Sierra Club argues that the fact the project met all eight objectives indicates that, to some extent, the project's approval was a foregone conclusion based on artificially narrow project objectives. But the fact that a project meets all of the stated objectives is

---

[8] We do note that groundwater projects *are* also being pursued, including recharge and recovery projects at Orestimba Creek and Los Banos Creek.

[9] Sierra Club observes that the FEIR does not state how often it is necessary to store and release water in a rapid manner. But we see no reason to require that.

Nor do we find relevant Sierra Club's discussion of the downsides to reservoirs. Every project has drawbacks and benefits. CEQA's concern is adequate environmental analysis and disclosure.

only an issue if those objectives are artificially narrow. If, instead, the objectives are properly stated, then it is quite reasonable and even expected that a project would meet all of the objectives formulated by its own proponents.

## VII. The FEIR Considered an Adequate Range of Alternatives

Siera Club also challenges the FEIR's discussion of alternatives.

### A. *Law*

"An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible. The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives. There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Cal. Code Regs., tit. 14, § 15126.6, subd. (a).)

"Among the factors that may be used to eliminate alternatives from detailed consideration in an EIR are: (i) failure to meet most of the basic project objectives, (ii) infeasibility, or (iii) inability to avoid significant environmental impacts." (Cal. Code Regs., tit. 14, § 15126.6, subd. (c).) "[T]he EIR need examine in detail only the [alternatives] that the lead agency determines could feasibly attain most of the basic objectives of the project." (*Id.*, subd. (f).)

### B. *Background*

In table 4-6 of the FEIR, 11 potential alternative sites are ranked on four criteria: capacity to surface area, capacity to dam embankment volume, capacity to dam height

and distance to the DMC.  The sites were given a cumulative score based on how they did on all four factors.

The proposed project site, Del Puerto Canyon received the best cumulative score. The site with the second-best cumulative score, Lone Tree Creek, was rejected for further consideration because it would have a surface area of 2,900 acres (i.e., more than three times larger than the project footprint).  The site with the third-best cumulative score, Little Salado Creek/Crow Creek, was rejected because its dam would be 4.5 miles from the DMC, resulting in a substantially longer conveyance facility, with commensurate increases in energy usage and greenhouse emissions.  In addition, multiple commenters during the scoping period urged consideration of the Ingram Canyon site, which had the fourth-best cumulative score.  As a result, the Ingram Canyon site was selected as the alternative site that would be considered in detail.

### C.    *Analysis*

Sierra Club cites *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277 (*Habitat*) for the proposition that an EIR fails to analyze a reasonable range of alternatives if it "fail[s] to consider *any* alternatives that would avoid some of the significant environmental impacts of the project."[10] (*Habitat, supra*, at p. 1303.)  Sierra Club contends the FEIR fails "for this exact reason" because the FEIR concludes the alternatives it considered were environmentally inferior to the project.  But there is an incongruity between the legal principle Sierra Club cites and the alleged deficiency in the FEIR.  An alternative that avoids *some* of the significant impacts of the project is not necessarily the same as an alternative that is, on balance, environmentally superior to the project.  That is, an alternative might avoid *some* of the significant impacts of the project yet still be, *on the whole*, environmentally inferior to the project.  And

---

[10]    This quotation is actually the court describing one of the parties' contentions, not describing its own holding.  (See *Habitat, supra*, 213 Cal.App.4th at p. 1303.)

30.

CEQA does not require that an EIR consider alternatives that are wholistically environmentally superior to the project, but instead requires consideration of alternatives that "avoid or substantially lessen *one or more* of the significant effects." (Cal. Code Regs., tit. 14, § 15126.6, subd. (c), italics added; see *id*., subd. (a) ["would avoid or substantially lessen *any* of the significant effects of the project"], italics added.) The FEIR did that here. For example, the Ingram Canyon alternative would substantially lessen the significant environmental impacts caused by the project's relocation/construction of new or expanded water, wastewater treatment or stormwater drainage, electric power, natural gas, or telecommunications facilities. While the EIR ultimately concluded the Ingram Canyon alternative was inferior to the project on the whole, that does not change the fact that the alternative would have "substantially lessened" *one or more* of the significant effects of the project.

## VIII.  The FEIR's Discussion of Alternatives Was Sufficient

Finally, Sierra Club argues the FEIR fails to provide sufficient information regarding the alternatives it did consider. They point to the alternative reservoir sites of Lone Tree Creek and Little Salado Creek/Crow Creek.

### A.  *Law*

The EIR's analysis of alternatives must "include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project." (Cal. Code Regs., tit. 14, § 15126.6, subd. (d).) "[T]he analysis must be specific enough to permit informed decision making and public participation." (*Laurel Heights, supra*, 47 Cal.3d at p. 406.) "The need for thorough discussion and analysis is not to be construed unreasonably, however, to serve as an easy way of defeating projects. 'Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.… [¶] When the alternatives have been set forth in this manner, an EIR does not become vulnerable because it fails to consider in detail each and every conceivable

31.

variation of the alternatives stated.' [Citations.] As with the range of alternatives that must be discussed, the level of analysis is subject to a rule of reason." (*Id* at pp. 406–407.)

"If an alternative would cause one or more significant effects in addition to those that would be caused by the project as proposed, the significant effects of the alternative shall be discussed, *but in less detail than the significant effects of the project as proposed*." (Cal. Code Regs., tit. 14, § 15126.6, subd. (d), italics added.)

### B. *Analysis*

Sierra Club faults the FEIR for not going into more detail in its analysis of the Lone Tree Creek and Little Salado Creek/Crow Creek site alternatives. But as long as an EIR considers in sufficient detail a reasonable range of alternatives, *it may eliminate other alternatives from detailed consideration*. (Cal. Code Regs., tit. 14, § 15126.6, subd. (c).) Here, the two alternative sites were eliminated from detailed consideration, so it is not surprising nor improper for the analysis to be truncated. The FEIR quite reasonably assumed that alternatives with triple the footprint or substantially longer conveyance facilities were not deserving of further detailed consideration when another alternative site, Ingram Canyon, *was* being analyzed in further detail.

Sierra Club points to the FEIR's statement that the Ingram Canyon alternative would have greater impacts on air quality, and argues the "basis for this claim is far from clear." Not so, the basis is clear:

> "A dam at Ingram Canyon would entail construction of a slightly larger embankment. Information from preliminary screening reports estimated that the Ingram Canyon dam would have a volume of 7.2 million cubic yards (CY) as compared to an initial estimate of 6.2 million CY for the proposed Del Puerto Canyon dam (note that this number will be refined as design progresses). The Ingram Canyon conveyance facility would also be substantially longer than the conveyance facility for the Del Puerto Canyon site (2.2 miles as compared to 0.9 miles). *Because of the extent of construction required, the Ingram Canyon site would not reduce emissions of criteria pollutants during construction. As noted on page 4-13 of the*

*Draft EIR,* '*This alternative would generate significant NO$_x$ emissions*, and it is uncertain whether emissions would be fully mitigable.'" (Italics added.)

Additionally, the FEIR explained that the Ingram Canyon site would require almost 95 gigawatt hours per year compared to the project's over 40 gigawatt hours per year, due to increased conveyance facility length and pumping to a higher elevation.

## IX. A Challenge to the Sufficiency of the EIR's Discussion of an Alternative's NOx Emissions is Not Cognizable

Finally, Sierra Club contends there is insufficient explanation for how the EIR can conclude mitigation measures will result in the project not creating significant NOx emissions, while being uncertain whether the emissions of the Ingram Canyon alternative are fully mitigatable. Project Partners contend this assertion is not cognizable because Sierra Club failed to exhaust its administrative remedies.

### A. *Law*

"'CEQA prohibits a petitioner or appellant from alleging noncompliance with the requirements of CEQA unless the alleged grounds for noncompliance were presented to the public agency either orally or in writing by any person during the public comment period or during the hearing on project approval. [Citations.] When a ground of noncompliance with CEQA was not raised during the comment period or during the public hearing on project approval, the right to raise the issue in a subsequent legal action is waived. The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.] "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." [Citation.] This requirement is known as the exhaustion doctrine. [Citation.] The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review.'" (*Planning & Conservation League v.*

33.

*Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 250 (*Castaic Lake Water Agency*).)

## B.     *Analysis*

Project Partners have contended that Sierra Club failed to exhaust its administrative remedies on this issue.  Sierra Club has not pointed us to anywhere in the record where this issue was raised.  Consequently, Sierra Club failed to carry their "'burden of demonstrating that the issue[] raised in th[is] judicial proceeding w[as] first raised at the administrative level.'"  (*Castaic Lake Water Agency, supra*, 10 Cal.App.4th at p. 250.)

## X.     The FEIR Adequately Addressed the Planned Relocation of Del Puerto Canyon Road

Project Partners, as cross-appellants, contend the court erred in concluding the FEIR did not adequately address the planned relocation of Del Puerto Canyon Road. Sierra Club responds that the Project Partners improperly segments the project by excluding the future relocation of Del Puerto Canyon Road.

## A.     *Law*

"Improper piecemealing occurs 'when the purpose of the reviewed project is to be the first step toward future development' or 'when the reviewed project legally compels or practically presumes completion of another action.' [Citation.]  By contrast, an EIR need not analyze 'specific future action that is merely contemplated or a gleam in a planner's eye.'"  (*East Sacramento Partnerships* 5 Cal.App.5th at p. 293.)

## B.     *Background*

The proposed reservoir will inundate a portion of Del Canyon Road, requiring that portion be relocated.  While the FEIR described the proposed alignment of the relocated road, it noted that "[t]he roadway alignment has been developed at a conceptual level and is subject to refinement during design.  Any alignment revision would be evaluated to determine if supplemental environmental documentation is required."  The proposed new

alignment would essentially follow the shoreline of the new reservoir, including a large number of horizontal curves with relatively small radii.

The FEIR identified Stanislaus County as the agency responsible for approving the proposed relocation of Del Puerto Canyon Road. The FEIR proceeded to evaluate the potential environmental impacts of the road relocation.

A management consultant submitted a comment on the draft EIR on behalf of the Stanislaus County Environmental Review Committee on January 27, 2020. The comment stated, in part,

> "As previously communicated through initial meetings, including the September 16, 2019 meeting between Stanislaus County Public Works and Project Partners, and ongoing discussions with the Project Partners, the alignment shown on page 3.13-2 is not an alignment Stanislaus County Department of Public Works (DPW) will support as the maintaining agency for public highways. The Department of Public Works looks forward to finalizing a new alignment with the Project Partners."

The FEIR responded to the comment acknowledging the county did not "support[]" the roadway alignment depicted in the draft EIR. The FEIR further responded:

> "The roadway alignment evaluated in the EIR would adequately replace the existing road and the Draft EIR has fully evaluated the impacts of the roadway alignment described in the Draft EIR; however, the Project Partners have not foreclosed consideration of other options. [¶] The Project Partners will continue working with County staff to develop an acceptable alignment and understand that further environmental review would be needed for a revised roadway alignment."

The trial court ruled the FEIR did not adequately address the planned relocation of Del Puerto Canyon Road because the roadway location was "unknown."

**C.    *Analysis***

Sierra Club reads this portion of the FEIR as "acknowledg[ing] that the road relocation identified and discussed in the EIR is not the location and alignment where the road will be located." Not so. After acknowledging the lack of support from the county,

35.

the EIR continued on to insist that the *current* alignment "would adequately replace the existing road."  Even the FEIR saying the Project Partners had "not foreclosed consideration of other options" and that environmental review of any such changes would be needed, indicates that it is a *possibility* that different options could be pursued *in the future*.  In this way, the FEIR again signaled that the current alignment was the status quo.

Reading the FEIR this way, there is no piecemealing issue.  The project proposed relocation of a road and analyzed the relocation of the road.  In other words, the analysis of the proposed relocation was not deferred or piecemealed.[11]

Sierra Club insists the county "rejected" the proposed alignment.  But a correspondence from a county committee saying another county department will not support the alignment is not the same as the county rejecting the proposed alignment.  A county acts on the alignments of its roads through its board of supervisors.  (Sts. & Hy. Code, § 940.)  Anything short of that, including lack of support from a county department, is not an actual rejection by the approving agency.  Of course, opposition from a county's public works department does not bode well for the Project Partners, because it seems as a practical matter that many supervisors vote in accordance with their staff recommendations on these sorts of issues.[12]  But the unlikelihood of a proposed project receiving ultimate approval does not erase an EIR's environmental analysis of it.  The fact remains that the environmental analysis of the road realignment was presented in the FEIR and was not segmented or deferred to a later date.  The trial court erred in concluding otherwise.

---

[11]    Given these case-specific circumstances, we find the cases cited by the parties unhelpful.

[12]    If, due to rejection by the board of supervisors or for some other reason, the Project Partners ultimately seek approval for a different alignment than the one analyzed in the FEIR, they may very well be required to do a subsequent or supplemental EIR to study the new alignment.  (See Pub. Resources Code, § 21166.)  The FEIR acknowledges as much.

## XI. The Court Abused Its Discretion in Denying Project Partners' Motion to Vacate

The Exchange Contractors, as appellants, challenge the court's denial of their motion to vacate a ruling concerning cultural resources.

### A. *Background*

The FEIR considered the project's impacts on cultural resources. The FEIR observed that "[m]ost of the study area was previously studied in 1993 as part of the Del Puerto Alternative Reservoir Site project (Bell et al. 1993). During this study, approximately 640 acres of the current project was subject to an archaeological pedestrian survey." We will refer to this as the 1993 Bell Survey. The FEIR concluded that "[b]ecause this survey was conducted over ten years ago and is not considered current, an updated survey was warranted for the current investigation." Accordingly, the FEIR consultant's primary environmental subconsultant ICF International (ICF) conducted pedestrian archaeological surveys in May–July 2019. A total of 10 archaeological sites were located in the area.

ICF also conducted subsurface testing at five of the sites. ICF also conducted records reviews and contacted Native American groups. Ultimately, 11 prehistoric archaeological resources were documented.

A survey and evaluation of all the archaeological sites yielded one unique archaeological resource: site P-50-344. That site was described as follows:

> "Site P-50-344 is a prehistoric occupation site consisting of four bedrock mortars and cupule features, an artifact surface scatter of lithic debitage (stone chips and flakes from making stone tools), groundstone (a stone tool for grinding) fragments, and one obsidian biface tool fragment located along the slope and base of a hill overlooking Del Puerto Creek to the south. Subsurface testing at the site identified a deposit of lithic debitage, a bone awl fragment, burned faunal material, freshwater mussel shell fragments and marine shell beads. The features and artifact deposit at the site are indicative of habitation along Del Puerto Creek, containing information important in prehistory, specifically to the prehistoric inhabitants of the local area. Because the site contains information

37.

important in prehistory (Criterion 4), and retains enough integrity to convey its significance, it appears eligible for listing in the [National Register of Historic Places] and [California Register of Historical Resources].  The site was evaluated in accordance with Section 15064.5 (a)(2)-(3) of CEQA Guidelines and using criteria outlined in Section 5024.1 of the [Public Resources Code] and is an Archaeological Resource for the purposes of CEQA."

The FEIR ultimately concluded that the project would have significant and unavoidable impacts because it would destroy the site.

### 2020 ICF Report

ICF created a report inventorying and evaluating the cultural resources at the Del Puerto Reservoir Project site, which we will refer to as the 2020 ICF Report.

### Section 106 Report

Apart from CEQA, federal law requires that federally licensed or federally funded undertakings must first consider "the effect of the undertaking on any historic property." (54 U.S.C. § 306108.)  Because Reclamation might issue federal funding for the project, the Project Partners underwent what is called the Section 106 cultural resources consultation process.  On February 3, 2020, the Project Partners' consultant transmitted a draft cultural report to Reclamation.  We will refer to this report as the Section 106 Report.  Reclamation provided feedback on the draft in May 2020.  ICF sent a final version of the Section 106 Report to Reclamation in September 2021.

The Section 106 Report and the 2020 ICF Report are substantially similar.

### Preparation of Administrative Record

Sierra Club elected to prepare the administrative record in this case pursuant to Public Resources Code section 21167.6, subdivision (b)(2).  The Project Partners provided documents to Sierra Club's counsel, including "an abbreviated confidential form" of the 1993 Bell Survey.  Sierra Club's counsel requested the full 1993 Bell Survey, to which Project Partners' counsel responded the document was likely confidential.  Project Partners' counsel later added that neither the Project Partners nor its

38.

consultant possessed the 1993 Bell Survey. Sierra Club's counsel indicated he would likely seek an order from the court compelling disclosure of the document. In order to avoid time-consuming law and motion proceedings, the Project Partners agreed to acquire and provide Sierra Club's counsel with the 1993 Bell Survey. However, the Project Partners would not agree to certifying the administrative record with the 1993 Bell Survey included unless the 2020 ICF Report was also included, because the FEIR expressly relied on the latter and not the former in its cultural resources analysis.

Pursuant to a stipulation of the parties, the court ordered that the 1993 Bell Survey and the 2020 ICF Report be kept confidential.

In a motion dated December 18, 2021, Sierra Club sought discovery of the files of the FEIR consultant's subcontractors and emails sent by Project Partners' consultants (to recipients other than employees of DPWD). On January 21, 2022, the court denied Sierra Club's request. The court determined that the files of the subcontractors to the FEIR consultant were not part of the "'public agency's files on the project.'"

On February 14, 2022, the Project Partners certified the administrative record. Both the 1993 Bell Survey and the 2020 ICF Report were included in the confidential portion of the administrative record.

In early 2022, Sierra Club's counsel informed Project Partners' counsel that he was considering filing a motion to strike the 2020 ICF Report from the administrative record. However, Sierra Club's counsel said he would not file the motion if Project Partners stipulated that, at the time DPWD approved the project, neither the 1993 Bell Survey nor the 2020 ICF Report were in the possession of DPWD or its FEIR consultant. In fact, the 2020 ICF Report *had* been in the possession of both DPWD and its FEIR consultant before project approval. However, because Project Partners' counsel misunderstood an email he had previously received, he believed the proposed stipulation was correct and signed it. According to Project Partners, the stipulation was not initially filed with the court.

The parties began filing merits briefing on the CEQA issues in April 2022. In a sealed brief, Sierra Club argued the FEIR's discussion of cultural resources was insufficient. Project Partners filed a responsive brief, contending that Sierra Club ignored the 2020 ICF Report and its contents. In a reply brief, Sierra Club argued that the 2020 ICF Report was not properly part of the administrative record because it was only in the possession of ICF, and not the Project Partners or their EIR consultant. Sierra Club contended that "[i]f the files were not before the agency, as they were not, then they cannot constitute substantial evidence supporting the agency's decision." As explained above, this assertion is actually incorrect; the 2020 ICF Report *was* in the possession of the Project Partners and their FEIR consultant before project approval. However, through no apparent fault of his own, Sierra Club's counsel believed otherwise due to Project Partners' counsel's mistaken assertion. The mistake still had not come to light when the court ruled on the merits of the cultural resources issues on November 29, 2022.

In its ruling, the court observed that Sierra Club "does not contest that the [2020 ICF Report] is adequate," but, instead, contended the report could not be relied upon. The court rejected Sierra Club's contention that the 2020 ICF Report was not part of the administrative record. However, the court found it "critical[]" that the 2020 ICF Report was not relied upon by the Project Partners, because it was provided "after the agency's decision." Consequently, it ruled in favor of Sierra Club on the merits of the cultural resources issue.

Project Partners' counsel considered filing a motion to vacate this ruling and accordingly contacted ICF, thinking they could explain why the 2020 ICF Report was not provided to the Project Partners or their FEIR consultant before project approval. ICF staffers responded that, in their recollection, they *had* provided the 2020 ICF Report to

the FEIR consultant in early-mid 2020,[13] which in turn provided the report to the Project Partners days later.  Through subsequent conversations, Project Partners' counsel came to realize his prior understanding of an October 21, 2021, email from the FEIR consultant was mistaken.  In that email, the consultant said he had "access to both reports," which Project Partners' counsel had originally understood to mean the draft and final versions of the Section 106 Report.  But Project Partners' counsel *now* understood that "both reports" referred to the Section 106 Report and the *2020 ICF Report*.

Project Partners filed a motion to vacate and amend the judgment pursuant to Code of Civil Procedure sections 663 and 473, subdivision (b).[14]  The motion explained the chronology of events through its memorandum of points and authorities and a declaration from Project Partners' counsel.  Counsel explained his mistake and apologized to the court.  The motion urged the court to amend its prior ruling since it had been based on the mistaken belief that Project Partners and their FEIR consultant were not in possession of the 2020 ICF Report before project approval.  Sierra Club opposed the motion.

The court denied the motion.  The ruling stated that the stipulation regarding the 2020 ICF Report had been provided in a dispute over whether Sierra Club's prior counsel could file an amicus brief.  The court held that a party may not offer a fact for one purpose to its advantage and then later ask the court to disclaim that fact.  The ruling also stated the court was "obligated" to accept stipulations as true (unless contrary to law or policy).

---

[13]   Recall that the FEIR was made available to the public and commenting agencies on October 9, 2020.

[14]   All further undesignated statutory references are to the Code of Civil Procedure.

**B.**     *Law*

Section 663 provides for a motion to set aside a judgment or decree when there was an "[i]ncorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts …." (*Ibid.*)  Section 473, subdivision (b), permits a court to "relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." (*Ibid.*)

We review the trial court's rulings under these statutes for abuse of discretion. (*Conservatorship of Buchenau* (2011) 196 Cal.App.4th 1031, 1038; e.g., *National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 524 [motion under § 663].)  "'Abuse of discretion is a deferential standard of review.'" (*Cadiz Land Co., Inc. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 117.)  "Although this standard is deferential, a court abuses its discretion '"where no reasonable basis for the action is shown."'" (*Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1367.)

"'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  "To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.'" (*Ibid.*)

"'[T]he provisions of section 473 … are to be liberally construed and sound policy favors the determination of actions on their merits.'" (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 256.)

**C.**     *Analysis*

The basis provided for the court's ruling is that the stipulation concerning the 2020 ICF Report was provided to the court pursuant to a dispute over whether Sierra Club's prior counsel could file an amicus brief.  The court reasoned that it would be unfair to

allow a party to offer a fact "for one purpose" and then disclaim the fact for another purpose. However, the court's factual premise was plainly incorrect. The stipulation was not entered into pursuant to a dispute over amicus briefing. Instead, the stipulation was offered to avert a motion to strike the 2020 ICF Report from the administrative record. In other words, it was offered pursuant to the same issue the court presently faced.

The ruling also stated the court was "obligated" to accept stipulations as true (unless contrary to law or policy). But the entire purpose of section 473, subdivision (b), is to provide relief from what the law would otherwise require or permit in a given situation. Observing that, without an excusable mistake, the law would provide for a particular outcome is no explanation for why relief should not be granted where an excusable mistake *is* present.

Consider a classic section 473, subdivision (b), scenario: an attorney requests relief from a default entered after he or she failed to file a timely answer to a complaint. It would not justify denial of relief to say that the law requires entry of default after the time to answer expires. The question is not the propriety of the court's initial action in response to counsel's mistake, but whether the attorney should be relieved from the court's admittedly proper action due to the attorney's excusable neglect. In sum, the fact that courts are obligated to accept stipulations as true does not explain why the court would deny a section 473, subdivision (b), motion to obtain relief therefrom.

Sierra Club correctly observes that section 663, paragraph 1, only applies where the decision has an "[i]ncorrect or erroneous *legal* basis," not an incorrect factual basis. (*Ibid.*, italics added.) But section 473, subdivision (b), is not so limited. Under that provision, "'mistake' justifying relief may be either a mistake of fact or a mistake of law. 'A mistake of fact exists when a person understands the facts to be other than they are; .…'" (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1368.)

43.

In light of the insufficient explanations provided by the trial court, we consider whether its approach was otherwise justified. We conclude it was not. Despite some of the convoluted background, the simple fact is the 2020 ICF report *was* in the possession of the Project Partners and their FEIR consultant prior to project approval.[15] And, as the trial court observed, Sierra Club does not effectively contest the sufficiency of the 2020 ICF report. We will not turn a blind eye to substantial evidence in the record merely because counsel misdescribed it earlier in the case and sought to rectify the good-faith error pursuant to a statute designed exactly for that purpose. We also question what purpose it would serve to invalidate the FEIR on such grounds when everyone knows the substantial evidence exists. What could such a writ effectively require of the Project Partners that would not be a waste of time and resources?

For these reasons,[16] we will reverse the trial court's denial of Project Partners' motion to vacate.

---

[15] Sierra Club contends the 2020 ICF Report was not part of the administrative record pursuant to the court's January 21, 2022, discovery order regarding the internal files of subcontractors. But the administrative record was certified on February 14, 2022, *after* the January 21, 2022, order *with* the 2020 ICF Report included. As for the incorrect stipulation, we conclude the court should have granted relief from it due to excusable mistake as explained herein.

Sierra Club also posits that the Exchange Contractors failed to argue that the 2020 ICF Report was a mandatory part of the record pursuant to Public Resources Code section 21167.6 as part of their motion to vacate. But they did not need to make that argument because the 2020 ICF Report was already part of the administrative record.

Sierra Club cites the court's November 29, 2022, ruling and says this court is "bound by the facts" as the trial court found them in that order. But that order expressly states, "Respondent contends that the ICF report provides substantial evidence supporting the EIR's conclusions. Petitioner's claim that this should not be part of the administrative record *fails* .…" (Italics added.)

[16] Also for these reasons, we do not address the other grounds Project Partners advance in defense of their motion to vacate.

**DISPOSITION**

The court's order denying the motion to vacate filed by DPWD and San Joaquin River Exchange Contractors Water Authority is reversed. The court is directed to enter a new and different order granting the motion consistent with the views expressed in this opinion.

The judgment is reversed in part and the court is directed to enter a new and different judgment consistent with this court's holding that the FEIR was sufficient with respect to the relocation of Del Puerto Canyon Road and cultural resources; and that the FEIR was insufficient with respect to impacts on terrestrial species downstream from the proposed reservoir.

The superior court is directed to issue a peremptory writ of mandate as soon as practicable after it has filed the modified judgment.

The parties shall bear their own costs on appeal.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

FAIN, J.*

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.